**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| ANITA LOPEZ, | No. C03-4015-MWB |
| Plaintiff, | |
| vs. | **MEMORANDUM ORDER AND OPINION REGARDING DEFENDANT'S AMENDED RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, AND, ALTERNATIVELY FOR NEW TRIAL AND FOR REMITTITUR OF ALL AMOUNTS AWARDED** |
| ARAMARK UNIFORM & CAREER APPAREL, INC., A Delaware Corporation, | |
| Defendant. | |
| MARICELA VILLALPANDO, | C03-4030-MWB |
| Plaintiff, | |
| vs. | |
| ARAMARK UNIFORM & CAREER APPAREL, INC., A Delaware Corporation, | |
| Defendant. | |

——————————

**TABLE OF CONTENTS**

I. *FACTUAL AND PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . 3
    A. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1. *Overview of Aramark* . . . . . . . . . . . . . . . . . . . . . . . . 6
        2. *Employment of Anita Lopez* . . . . . . . . . . . . . . . . . . . . 8

   **3.** *Employment of Maricela Villalpando* . . . . . . . . . . . . . . . . 12

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
 **A. Arguments Of The Parties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
  **1.** *The defendant's arguments* . . . . . . . . . . . . . . . . . . . . . 15
  **2.** *The plaintiffs' arguments in resistance* . . . . . . . . . . . . . 21
  **3.** *The defendant's reply* . . . . . . . . . . . . . . . . . . . . . . . . 25
 **B. Motion For Judgment As A Matter Of Law** . . . . . . . . . . . . . . . . . 27
  **1.** *Standards for judgment as a matter of law* . . . . . . . . . . . 27
  **2.** *Federal and Iowa law claims* . . . . . . . . . . . . . . . . . . . . 30
   *a.* *Failure to engage in protected activity* . . . . . . . . 32
   *b.* *Failure to prove adverse employment action* . . . . . . 34
   *c.* *Failure to prove causal connection* . . . . . . . . . . . 38
   *d.* *Proffer of legitimate, nondiscriminatory reason and*
    *pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
  **3.** *The hostile work environment sexual harassment claims* . . . . 40
   *a.* *Actionable harassment* . . . . . . . . . . . . . . . . . . 41
   *b.* *Applicability of the* **Ellerth/Faragher** *affirmative*
    *defense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   *c.* *Iowa law* . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
  **4.** *The emotional distress damages* . . . . . . . . . . . . . . . . . . 51
  **5.** *Villalpando's entitlement to back pay damages* . . . . . . . . . 55
  **6.** *The punitive damages* . . . . . . . . . . . . . . . . . . . . . . . . 57
   *a.* *Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . 57
   *b.* *Malice or reckless indifference by managerial*
    *employee* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
   *c.* *Aramark's good-faith defense* . . . . . . . . . . . . . . 74
 **C. The Amount Of The Punitive Damages Award** . . . . . . . . . . . . . . . 79
  **1.** *Excessive verdict* . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
  **2.** *Statutory damages cap provision* . . . . . . . . . . . . . . . . . 82
  **3.** *Constitutionality* . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
   *a.* *Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . 82
   *b.* *Analysis under the* **Gore** *guideposts* . . . . . . . . . . . 84
    *i.* *Reprehensibility* . . . . . . . . . . . . . . . . . . . 84
    *ii.* *Proportionality* . . . . . . . . . . . . . . . . . . . 87
    *iii.* *Comparable civil or criminal penalties* . . . . . . 89
    *iv.* *Resolution* . . . . . . . . . . . . . . . . . . . . . . 90

2

       **4.**     *Remittitur* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

   **D. New Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

       **1.**     *Standards under Rule 59(e)* . . . . . . . . . . . . . . . . . . . . . 91

       **2.**     *The merits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Following a five-day jury trial in this hostile work environment sexual harassment and retaliation case brought by two former employees of a local provider of uniform and career apparel, the jury returned a verdict in favor of the two individual plaintiffs. The jury awarded both plaintiffs past emotional distress and punitive damages on both their hostile work environment sexual harassment and retaliation claims. A number of post-trial motions followed the jury's disposition of this case. Not surprisingly, in light of the rather generous verdict, the defendant seeks judgment as a matter of law on both the plaintiffs' hostile work environment sexual harassment and retaliation claims and the corresponding awards of punitive damages. In the alternative, the defendant seeks a new trial on the issue of punitive damages and/or remittitur of all amounts awarded to the plaintiffs. Predictably, the plaintiffs resist the defendant's motion on all grounds.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

Plaintiffs Anita Lopez (Case No. C03-4015-MWB) and Maricela Villalpando (Case No. C03-4030-MWB) filed separate law suits against their former employer, defendant Aramark Uniform & Career Apparel, Inc., (hereinafter "Aramark" or "defendant") each asserting claims of hostile work environment sexual harassment, *quid pro quo* sexual

harassment, and retaliation for complaining about sexual harassment. In addition, Villalpando contended she was constructively discharged by Aramark as the result of sexual harassment and retaliation. By order dated March 18, 2004 (Doc. No. 19), the court consolidated the plaintiffs' separate lawsuits for trial. A five-day jury trial commenced on October 31, 2005. The jury returned a verdict in favor of both plaintiffs on their claims of hostile environment sexual harassment and retaliation (Doc. No. 60).[1] More specifically, with respect to Anita Lopez, the jury found Lopez proved her hostile environment sexual harassment claim and awarded her $30,000.00 in past emotional distress damages and $250,000.00 in punitive damages. In addition, the jury found in Lopez's favor on her claim of retaliation and awarded her $5,000.00 in past emotional distress damages and $10,000.00 in punitive damages. With respect to Maricela Villalpando, the jury awarded $30,000.00 in past emotional distress damages, $10,000.00 in backpay and $250,000.00 in punitive damages on her hostile environment sexual harassment claim. In addition, Villalpando received an award of $5,000.00 for past emotional distress and $10,000.00 for punitive damages with respect to her claim of retaliation.

On November 16, 2005, Aramark filed a Motion To Contact Jurors (Doc. No. 64) in order to ascertain the jurors' opinions and impressions of the trial. The court granted this motion with respect to counsel for both parties on November 28, 2005 (Doc. No. 69). Aramark further filed a Renewed Motion For Judgment As A Matter Of Law And, Alternatively For New Trial And Remittitur Of All Amounts Awarded (Doc. No. 65) on November 18, 2005. Pursuant to the order of this court, although the defendant's motion

---

[1]Only the hostile environment sexual harassment and retaliation claims were submitted to the jury.

was to be timely filed, the defendant was allotted additional time in which to file its brief, in order to account for the time that would be required to obtain a trial transcript from the court reporter.  An Amended Motion was filed on November 21, 2005 (Doc. No. 68).  On December 1, 2005, the plaintiffs filed a Fee Application (Doc. No. 70).  The defendant filed a resistance to the plaintiffs' Fee Application on December 30, 2005.  This court reserved ruling on the plaintiffs' Fee Application until after the resolution of the post-trial motions and the conclusion of the case (Doc No. 75).

On January 10, 2006, the defendant filed a Supplemental Motion For An Evidentiary Hearing To Determine Juror Misconduct And For New Trial (Doc. No. 82). On February 2, 2006, the plaintiffs filed their resistance to the defendant's motion (Doc. No. 87).  On this same date, the defendant filed its Memorandum For Judgment As A Matter Of Law, And, Alternatively For New Trial, And For Remittitur Of All Amounts Awarded (Doc. No. 86).  On February 8, 2006, the defendant filed its reply to the plaintiffs' resistance to its Supplemental Motion For An Evidentiary Hearing (Doc. No. 89).  On February 22, 2006, this court denied the defendant's Supplemental Motion For An Evidentiary Hearing To Determine Juror Misconduct And For New Trial.  Specifically, this court determined the defendant had failed to demonstrate it was entitled to an evidentiary hearing on the matter.  Thereafter, on March 3, 2006, the plaintiffs filed their brief in support of their resistance to the defendant's Motion For Judgment As A Matter Of Law, And, Alternatively For New Trial, And For Remittitur Of All Amounts Awarded (Doc. No. 93).  The defendant filed its reply on March 14, 2006 (Doc. No. 100).  As the parties have each filed briefs in support of their respective positions and neither has requested oral argument, the court deems this matter fully submitted and will proceed to address the merits of the parties' respective arguments.

## B. Factual Background[2]

### 1.    Overview of Aramark

Aramark is a leading provider of food and facilities management services, as well as uniform and career apparel. The Sioux City, Iowa, facility is operated by Aramark Uniform Services, which is headquartered in Burbank, California and is part of Aramark Uniform & Career Apparel. The Sioux City facility is responsible for laundering, pressing and organizing linens, table cloths, napkins, aprons and bar towels from myriad customers. Once the items are processed, the facility then redistributes the product to its customers. At all times relevant to this lawsuit, Steve Donly served as president of Aramark Uniform Services. Four regional vice presidents led operations. Sioux City was encompassed in the "Northern Group," of which Tom Janssens served as the group vice president. With respect to the Sioux City facility, Victor Herzberger served as the general manager throughout the plaintiffs' employment. Herzberger, as general manager, was responsible for approximately eighty personnel employed at the Sioux City location, as well as another sixteen employees located in Sioux Falls, South Dakota. The Sioux City location was divided into three main components: service, production and the office. In addition, certain route representatives who were responsible for meeting with customers were associated with the Sioux City location. Plaintiffs Lopez and Villalpando both worked at Aramark's Sioux City, Iowa, facility in the production department. The production division was managed by Jay Wisecup, who served as plant or production manager. He was supported by two supervisors—Victor "Butch" Tomoson and Greg O'Connor.

---

[2]As to be discussed more fully below, the court recites these facts in the light most favorable the plaintiffs, according them the benefit of all reasonable inferences drawn from the evidence at trial. *See Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991).

O'Connor and Tomoson each supervised approximately 22 employees. Although Wisecup was responsible for the entire production operation, O'Connor and Tomoson assisted Wisecup by basically managing their specific areas within the production department. This included hiring production employees, handling daily job assignments, disciplining employees and supervising and managing the personnel within each of their respective sections. The decision to terminate an employee, although initiated by the supervisors, required Wisecup's approval. Both of the plaintiffs were hired and supervised by Tomoson in the production division. The production employees had varying responsibilities. For example, some employees would iron and fold table linens, others would fold laundered towels and package them in bundles. The easiest job involved sorting different colored napkins. Many, if not most, of the individuals hired and supervised by Tomoson were Hispanic women, some who spoke little to no English, and many of whom were illegal.

With respect to Equal Employment Opportunity (EEO) compliance, Aramark posted its EEO policy, which specifically addressed sexual harassment and set forth an internal complaint procedure. Similarly, the company also posted a "5 in 1" poster, which referenced various legal obligations, including EEO.[3] Further, Aramark Uniform Services' Employee Handbook for Non-Union Employees also set forth a detailed harassment policy and complaint procedure.[4] During the plaintiffs' tenure, a training session on the Aramark 1-800 Employee Hotline was also conducted. During this session, which both plaintiffs attended, a videotape was shown to all employees that described the

[3]Neither plaintiff, however, remembered seeing or being informed of these postings.

[4]Neither plaintiff received this handbook, presumably because both Lopez and Villalpando were union employees, and the handbook was for non-union personnel.

features of the employee hotline. Essentially, the hotline was implemented in order to provide employees an avenue to report their concerns confidentially to an individual outside of their place of employment. The video was only shown in the English language, despite the fact that some workers spoke little to no English. In addition, the video was shown on a small, 13-inch television set. Many of the employees were talking loudly during the video and not paying attention, making the video virtually inaudible and unobservable. Following the video, no additional discussion ensued and the employees returned immediately to work. Before the training was concluded, the employees were distributed a 1-800 hotline reference card, which also summarized the facets of the hotline and listed the number.

### 2.    *Employment of Anita Lopez*

With respect to plaintiff Lopez, Tomoson conducted her interview and hired her as an iron pressing machine operator on November 19, 2001. Her employment was terminated on March 19, 2002. During her four-month tenure at Aramark, Lopez missed 21 days of work. Nine of these days occurred between January 1, 2002, and February 11, 2002. Immediately after she was hired, Lopez began observing what she considered to be inappropriate sexual conduct occurring at Aramark. On her first day of work, she witnessed Tomoson simulate a sexual act behind another coworker, Rocio Orozco. Tomoson came up behind Orozco and rubbed his groin on her buttocks. Orozco laughed at Tomoson's conduct. Lopez told another coworker, Paulina Sandoval, about what she had witnessed and Sandoval relayed to Lopez that those kind of things "happen here." Lopez observed that Tomoson spent a great deal of time with his female employees at the irons and that he routinely touched the female employees' buttocks and waists, and occasionally picked them up from behind. Lopez overheard him tell numerous dirty jokes, including jokes about his wife. On one occasion, Lopez heard Tomoson inform his

employees that his wife did not have large breasts like they did. Lopez also saw Tomoson engage in a form of "dirty dancing," in which it appeared as if he was having sex behind his female employees. On one specific occasion, Lopez witnessed Tomoson dirty dance behind Villalpando and place his hand on her shoulder. Additionally, every Thursday, Tomoson would make reference to a yellow polka dot bikini and identify, by name, the employee who was allegedly going to put on the bikini for him. On another occasion, Lopez observed Tomoson dancing around the office in front of his employees while wearing a bikini. Tomoson also directly harassed Lopez. He blatantly leered at her breasts three out of five days of the week. On one occasion, he announced to the other workers that Lopez was going to wear a yellow polka dot bikini and then laughed at this prospect, along with the rest of the coworkers. On another occasion, Lopez bent over to pick up a napkin she had dropped. While she was bent over, Tomoson hit her buttocks with a brown paper bag that contained a "to-go" food container. Lopez stood up and said, "Hey, hey, hey," to Tomoson. Tomoson replied, "Don't stick that ass out at me like that," laughed and walked away. On yet another occasion, Tomoson pinched Lopez's left side, just above her hip region. Lopez told Tomoson, "Don't." Again, he laughed and walked away. On the day before his birthday, Tomoson announced that Lopez was going to wear a bikini for his birthday the following day and stated that it would be a "nice present" to him. Lopez also witnessed Tomoson behave similarly with the union representative, Vicky Freeman. For example, Tomoson dirty danced with Freeman, whistled at her, told dirty jokes to her and talked dirty to her. In light of this relationship, Lopez felt she could not go to Freeman to complain about Tomoson's conduct. Tomoson's conduct angered Lopez and, typically, when such conduct occurred, she flashed him evil looks and walked away. Lopez's resistance to Tomoson's behavior polarized her from the remainder of the employees who acquiesced to Tomoson's advances. The coworkers who

did not object to Tomoson's actions were often referred to as his "pets," and were permitted to leave for break early and return late. Additionally, Tomoson's "pets" were assigned easier job duties. Particularly illustrative of this environment was an incident that occurred sometime in December 2001. After Lopez received a relatively "easy" job task, Tomoson said to her, "See how easy you can have it?" Lopez replied, "I am not here to play; I'm here to work." Immediately after this interaction, Tomoson assigned Lopez to a substantially harder assignment and tasked one of his "pets" to the easier job. Tomoson's conduct created a rift between his "pets" and the employees, like Lopez, who objected to his behavior. Workplace friction ensued. On one occasion, when both Tomoson and Wisecup were present, Lopez heard Yesenia Espinoza, one of Tomoson's pets, berate Villalpando with an epithet in Spanish that roughly can be translated to "fuck your mother." Lopez also saw Villalpando get pushed by another coworker. Lopez, as a witness, filed an incident report in which she utilized the term "breast." The next day, Tomoson bumped Lopez on the hip with his hip and indicated he read her report and thought her use of the word "breast" was funny.

Other incidents attributing to Lopez's dissatisfaction continued to occur throughout her employment. For instance, at some point, Lopez became aware that Villalpando had utilized the 1-800 hotline, and that others at Aramark, including Tomoson, were also aware of this fact, despite Aramark's representation to its employees that the hotline was confidential in nature. Lopez overheard Tomoson tell Espinoza and Jessica Coronado, another one of his pets, that Villalpando would be returning to work. When Espinoza and Coronado expressed concern about working with Villalpando, Tomoson reassured them, "Don't worry about it. We have plans for Maricela."

Due to the environment at Aramark, Lopez became extremely depressed. Although Lopez had problems with both post-traumatic stress disorder and major depressive disorder

prior to her job at Aramark, her Aramark experience greatly magnified and aggravated these conditions. Lopez became extremely depressed every Sunday before she had to go to work and cried daily. She felt belittled and had low self-esteem as a result of Tomoson's conduct, which often brought back memories of her childhood. Lopez was put on anxiety medication and continued to seek mental health counseling

On the Friday before she was terminated, Lopez wore a shirt with "Tweety Bird" on the front. Tomoson asked what the name of the bird was on her shirt. Orozco informed him the bird's name was Tweety Bird, to which Tomoson replied, "Not the way that she is wearing it, it's not. It's Big Bird." As Tomoson made this comment, he was looking at Lopez's breasts. Lopez turned around and walked away. Later on that same Friday, Lopez, Orozco, and Espinoza were running an iron. Orozco told Lopez to shake her chest, which Lopez indicated she refused to do. As she turned away, she saw Tomoson grinding his hips behind her. Upon seeing Tomoson, Lopez screamed and Tomoson and the other coworkers laughed. That evening, she informed her husband that she wanted breast reduction surgery because she was tired of being teased.

The following Monday, March 18, 2002, Lopez called in sick to work. The next day, Tuesday, she had a friend who was not associated with Aramark, call in to report Lopez had a doctor's appointment and was unable to come into work. Approximately ten minutes later, Lopez spoke with Tomoson, who informed her she was fired. On March 20, 2002, Lopez went to Ted Colt, the business agent for the union who handled grievances and related union business with respect to Aramark. Lopez told Colt she was discharged for absenteeism and that she wanted her job back. Colt inquired as to the reason for Lopez's numerous absences. Lopez indicated she had been harassed, and a grievance was subsequently prepared. As soon as Herzberger received the grievance from the union, he notified the group vice president of the northern group, Janssens. In

addition, Herzberger telephoned Mike Grabowski, regional director of human resources. Herzberger then contacted Colt to coordinate a meeting to investigate the allegations. As part of the investigation procedure, Lopez was interviewed within a week of her termination. Freeman, Colt, and Scott Utech[5] were present at Lopez's interview, along with Wisecup and Herzberger. Wisecup and Herzberger conducted the interview as the representatives of the company and focused their questions on Lopez's claim of sexual harassment. Lopez identified three coworkers who allegedly were in a position to observe the conduct of which she complained. Herzberger interviewed at least two of the three coworkers whom Lopez identified as witnesses, but no one corroborated Lopez's allegations. Tomoson was also interviewed and denied the allegations. Herzberger then reported the results of his investigation to Grabowski. Based on the results of the investigation, Grabowski concluded that Lopez's claims were unsubstantiated because they could not be corroborated by Tomoson or any of Lopez's witnesses. Likewise, Colt concluded Lopez had a very weak case. Although Colt was prepared to take the case to arbitration, such proceedings were discontinued upon Lopez's advisement to the union that she did not wish to return to work for Aramark. Thereafter, on May 31, 2002, Lopez filed her charge of discrimination with the Iowa Civil Rights Commission ("ICRC'). Tomoson was never further investigated or disciplined by the company, nor was additional sexual harassment training conducted following Lopez's termination.

### 3. *Employment of Maricela Villalpando*

Villalpando's Aramark experience was similar to Lopez's. She began working for Aramark in May 2001 and remained employed by the company until April 17, 2002.

---

[5]At this time, Scott Utech was in training to take over for Colt as business agent for the union.

Throughout her employment, Villalpando was also supervised by Tomoson and assigned to work on the irons. Lopez was one of her coworkers during the four months Lopez was employed by Aramark. Shortly after Villalpando began working at Aramark, she likewise began to notice Tomoson's inappropriate conduct. She observed Tomoson associating with the female employees by the irons and saw him frequently dirty dance behind the female employees and heard him tell dirty jokes and refer to breasts. Tomoson often joked specifically about Villalpando's breasts to other coworkers. He would also frequently tell her that she had "big breasts," and describe how she would look in a bikini with her "big boobs." Villalpando told him not to say things like that to her. Tomoson also attempted to dirty dance with Villalpando. On one occasion, he placed his hand on her shoulder and tried to dirty dance behind her. Villalpando turned around and told Tomoson to quit. Tomoson told her not to get upset, laughed, and told two other coworkers about Villalpando's reaction. Tomoson also compared Villalpando to his wife. He told Villalpando that because his wife had small boobs, he would tell her she should get big ones because he liked big breasts and liked to see them move. Other coworkers who overhead this interaction laughed along with Tomoson. Villalpando also witnessed the occasion where Tomoson wore a bikini at work. She further witnessed Tomoson pick coworkers up and shake them so he could see their breasts move. At one point, Tomoson attempted to pick Villalpando up and grabbed her underneath her breasts from behind. Villalpando became angry so Tomoson instead picked Espinoza up and said, "Look, Yesenia doesn't get mad." Another incident occurred when Villalpando was wearing a yellow Tweety Bird shirt. Similar to what happened to Lopez, Tomoson asked Villalpando what was on her shirt and she replied, "Tweety," to which Tomoson countered in Spanish, "No, it's big boobs." Villalpando repeatedly complained to Wisecup and Freeman about Tomoson's behavior, and although they assured her they would take care of things, nothing

changed at Aramark. Apparently, after Villalpando objected to Tomoson's behavior, he began treating her differently by giving her more difficult job assignments. In addition, if she had to call in to work, Tomoson would hang up on her. Villalpando's objections to Tomoson's conduct also affected her relationships with her coworkers. The coworkers designated as Tomoson's "pets" teased Villalpando and talked to her in a rude, aggressive manner. They began calling her "Chuckie with the big boobs." Villalpando was ostracized by Tomoson's pets, and at some point, a physical altercation occurred between Villalpando and Coronado and Espinoza, where Coronado and Espinoza scratched Villalpando. On another occasion, in January of 2002, Coronado pushed Villalpando. Villalpando went to the hospital following this incident for a resulting back injury. Villalpando was aware of Aramark's 1-800 hotline and called it two times on the same day, once in English and then again in Spanish, to complain about Tomoson's and her coworkers' behavior. Although Aramark touted the confidential nature of the hotline, it became apparent to Villalpando when she returned to work that her coworkers knew she had called the hotline. One coworker told Villalpando that someone had called the hotline and that everyone knew at the plant. Coronado and Espinoza told Villalpando they were upset with her because she had called the hotline.

Following her back injury, Villalpando was restricted by her doctor to light duty. She would provide Tomoson with notes from her doctor. Tomoson would angrily "snatch" the notes out of her hand and send her to work without providing her an opportunity to explain or discuss the situation. Often, Tomoson would refuse her requests for light duty. Similar to Lopez, she became extremely depressed and experienced daily crying spells. She degenerated from a generally happy person to a person who was sad all the time. She became anxious, was frequently sick and hospitalized. The environment at Aramark eventually caused Villalpando to quit her job on April 17, 2002. Her troubles

worsened after she lost her job at Aramark because she began to fall behind on bills. Due to her lack of financial stability, Villalpando began fighting with her husband, further compounding her depressive state. One week after Villalpando terminated her employment, she went to speak with Wisecup in order to ask for her job back because she needed the money. Wisecup told her to leave, and Villalpando viewed herself as being fired. Subsequently, on May 31, 2002, Villalpando filed charge of discrimination with the ICRC. Villalpando was unable to secure new employment, although she applied at numerous places, until November of 2003 when she was hired by Curly's Food, Inc.[6]

## II. LEGAL ANALYSIS

### A. Arguments Of The Parties

#### 1. The defendant's arguments

The defendant raises myriad arguments in support of its motion for judgment as a matter of law and challenges numerous aspects of the plaintiffs' claims. First, the defendant argues that both plaintiffs failed to establish a prima facie case of retaliation because neither Villalpando nor Lopez (1) engaged in a protected activity, or (2) suffered an adverse employment action. To this end, the defendant contends the plaintiffs failed to complain about or challenge any perceived illegal action. Therefore, the defendant contends the plaintiffs logically could not have been the target of retaliation since there was nothing to retaliate against. Furthermore, the defendant argues that neither plaintiff proved an adverse employment action was taken against her. The defendant asserts that although the evidence suggests Lopez and Villalpando were assigned to the "harder" jobs in the

---

[6]Curly's Foods Inc. is a division of John Morrell and is an industry leader in manufacturing further processed meat products.

production department, such alleged changes in work assignments are insufficient because they constitute only a mere inconvenience. With respect to Villalpando, the defendant contends she quit her job of her own volition. Thus, the defendant asserts this was not an adverse employment action. Further, with respect to Lopez, the defendant avers it proffered a non-retaliatory reason for the alleged reason by virtue of Lopez's excessive absenteeism. In light of the exorbitant number of days Lopez was absent from work, the defendant contends she failed to meet her burden to show Aramark's non-retaliatory reason was pretextual.

The defendant next claims the plaintiffs failed to establish they were subjected to a hostile work environment in violation of Title VII. Specifically, the defendant claims neither plaintiff established the fourth element of a hostile work environment claim—that the harassment affected a term, condition or privilege of employment. According to the defendant, neither plaintiff established they were subjected to an environment that was objectively hostile because they failed to demonstrate the harassment was severe or pervasive, as is required to support a sexually hostile work environment claim.[7] While the defendant concedes the plaintiffs' allegations may be indicative of boorish, unprofessional and immature behavior, the defendant contests the fact that such allegations rise to the level of actionable harassment. In addition, the defendant argues neither Lopez nor Villalpando proved a tangible employment action was taken against her. Thus, the

---

[7]The defendant repeatedly asserts the plaintiffs failed to prove the environment was sufficiently severe *and* pervasive. However, this court notes, the correct standard is severe *or* pervasive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996). Thus, proof of either severe or pervasive harassment suffices; the plaintiffs did not, as the defendant represents, have to prove the harassment was both in order to succeed on their hostile work environment claim.

defendant claims the *Ellerth/Faragher* affirmative defense prevented liability from attaching to Aramark because the company had an established anti-harassment policy and the plaintiffs unreasonably failed to take advantage of the preventive opportunities established therein.

The defendant raises these very same arguments with respect to the plaintiffs' claims under the Iowa Civil Rights Act ("ICRA"). The defendant points out that, generally, retaliation claims under the ICRA are evaluated under the same standards as federal retaliation claims. Similarly, the defendant argues a hostile work environment sexual harassment claim under the ICRA is analyzed the same way as under Title VII, with only one exception—the Iowa courts have never adopted the *Ellerth/Faragher* model for vicarious liability. Instead, at least according to the defendant, under Iowa law, the employer's liability for sexual harassment perpetrated by supervisors or coworkers is dependent upon whether the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. This element, avers the defendant, has not been established by the plaintiffs because the defendant was not made aware of the harassment until after the plaintiffs' employment was terminated.

In the alternative, the defendant attacks the damage awards provided to both plaintiffs. Specifically, with respect to the damages awarded for emotional distress, the defendant contends Lopez and Villalpando presented insufficient evidence to sustain an award of emotional distress damages. The defendant avers the testimony presented by both plaintiffs was vague and lacked credibility. Further, the defendant contends it proffered evidence that both plaintiffs were having emotional problems prior to their employment at Aramark. Thus, the defendant argues the evidence shows that both Lopez and Villalpando had other stressors and past trauma in their lives that was primarily responsible for the plaintiffs' emotional distress.

The defendant next attacks Villalpando's award for back pay damages. The defendant points out that Villalpando testified she obtained new employment in November of 2003, and that the benefits she receives at her new place of employment are better than the benefits she received during her tenure at Aramark. The defendant contends the jury's award of $18,000 in back pay damages fails to take into account Villalpando mitigated her damages and was able to obtain a job with higher pay and better benefits.

Finally, the defendant requests this court enter judgment as a matter of law with respect to the jury's award of punitive damages to both plaintiffs. The defendant contends the evidence presented at trial by the plaintiffs fails to establish that Aramark acted with malice or reckless indifference to the plaintiffs' rights. With respect to Lopez, the defendant avers the evidence presented during trial establishes that once Aramark received Lopez's grievance subsequent to her termination, the company conducted a thorough investigation of the claim, but Lopez's allegations could not be substantiated. With respect to Villalpando, the defendant argues the evidence presented at trial compels the conclusion that Villalpando never complained to the management regarding Tomoson's conduct. The defendant points out that Villalpando's testimony at trial that she complained to Wisecup is at odds with her deposition testimony in which she represented she couldn't remember if she complained to anyone. Additionally, although Villalpando testified she called the 1-800 hotline to report Tomoson's conduct, the defendant highlights the fact that Villalpando's testimony contradicts Lopez's testimony that Villalpando simply called to report that certain coworkers were working illegally. Further, the defendant relies on Herzberger's testimony that no one called the 1-800 number to complain about sexual harassment, but did call to complain to report that Tomoson was sleeping in his truck during work. Thus, the defendant contends the only logical conclusion that can be arrived at from these facts is that Villalpando never actually made a complaint. Accordingly, the

defendant contends there is not sufficient evidence of malice on behalf of Aramark because it promptly investigated the only complaint it received.

Second, with respect to the conduct engaged in by Tomoson, the defendant argues punitive damages for his conduct cannot be imputed to the company because Tomoson was not serving in a "managerial capacity," as is required by the Supreme Court's decision in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). Rather, the defendant avers Tomoson was merely a front-line supervisor, with very little discretion of his own, and that his title is not dispositive of the issue under *Kolstad*. The defendant specifically points out that although Tomoson had the authority to hire employees, he did not have the authority to fire anyone without the approval of Wisecup.

Finally, the defendant argues an additional and independent basis exists for setting aside the punitive damages—namely, that Aramark made good faith efforts to comply with Title VII. Specifically, the defendant contends the evidence adduced at trial demonstrated Aramark had established procedures to address complaints of workplace harassment. In support of this assertion, Aramark points out that the nonunion employee handbook contained a nondiscrimination policy, an EEO poster was hung in the facility, and that training with respect to the 1-800 hotline was conducted. Under *Kolstad*, the defendant asserts this is enough to relieve it of imputed liability for Tomoson's conduct, which was contrary to the procedures established by Aramark.

In the event judgment as a matter of law is not granted, the defendant alternatively requests a remittitur of all amounts awarded. With respect to the punitive damages, the defendant claims it has been subjected to a miscarriage of justice because the award was grossly excessive in light of the evidence presented at trial. Specifically, the defendant implies that Villalpando testified falsely due to inconsistencies between her trial testimony and her responses on her ICRC questionnaire and her deposition testimony. The defendant

further asserts the punitive damages are inconsistent with the guideposts established by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), regarding the constitutionality of punitive damages. As such, the defendant contends due process mandates the punitive damages awards be reduced so that they comport with due process.

With respect to the compensatory damages awarded to the plaintiffs, the defendant avers the awards should be remitted because the evidence supporting the awards is insufficient, primarily because the evidence supporting the awards was based on the plaintiffs' testimony. The defendant contends the plaintiffs' testimony was vague and largely uncorroborated. Therefore, the defendant argues a reduction in the emotional distress damages awarded the plaintiffs is warranted. The defendant further contends Villalpando's award of back pay should be remitted because the evidence at trial demonstrated she secured a more lucrative position following her discharge from Aramark.

The defendant's final argument is that a new trial should be granted due to Villalpando's false testimony. The defendant contends the inconsistencies between her trial testimony and her deposition testimony and responses on the ICRC questionnaire indicate she was untruthful to the jury and that her testimony impacted the punitive damages awarded in the case. The defendant points out that, during trial, Villalpando's testimony was that she complained to Wisecup and Freeman but her complaints were never addressed.[8] However, previously, during her deposition, Villalpando indicated she did

---

[8]In its brief, the defendant actually contends Villalpando testified she complained to the "General Manager," which based on the record would have been Herzberger. However, after an extensive review of the trial transcript it is clear that Villalpando indicated she complained to "Jay," meaning Jay Wisecup, the production manager, not the general manager as asserted by the defendant. *See* Trial Tr. 648:11-25; 644:3 to 654:8.

not remember if she complained to anyone and her response on her ICRC questionnaire indicates she did not complain to anyone because she was afraid of Tomoson's response. Such improprieties, contends the defendant, warrant a new trial in this case on both the issue of liability and damages.

## 2.  *The plaintiffs' arguments in resistance*

Predictably, the plaintiffs resist all aspects of the defendant's motion for judgment as a matter of law.  With respect to their retaliation claims, the plaintiffs argue they engaged in the most basic form of protected activity when they told Tomoson to stop his offensive conduct.  The plaintiffs assert the record establishes that they objected to Tomoson's behavior on numerous occasions.  In addition, plaintiff Villalpando argues that the record supports the conclusion that she not only called the 1-800 hotline to report Tomoson's conduct, but that she also complained repeatedly to Wisecup and Freeman on numerous occasions.  Thus, the plaintiffs assert the defendant's motion in this aspect is without merit.  Second, the plaintiffs assert that they both proved the existence of an adverse employment action, contrary to the defendant's assertions.  With respect to Lopez, she points out that it is undisputed she was terminated.  Similarly, Villalpando contends her constructive discharge is sufficient to constitute an adverse employment action. Further, both plaintiffs argue the record supports the conclusion that Tomoson's assignment of materially harder work duties and significantly less favorable treatment suffices to demonstrate an adverse employment action.  Finally, the plaintiffs argue they produced an abundance of evidence demonstrating a causal connection between the protected activity and the adverse employment action.  As such, the plaintiffs contend judgment as a matter of law is not appropriate with respect to their claims of retaliation.

The plaintiffs likewise contend sufficient evidence was presented during trial to support the jury's finding that Lopez and Villalpando were subjected to a hostile work

environment.  The plaintiffs argue that the evidence taken in a light most favorable to them establishes that they were subjected to a work environment where Tomoson would stare at their breasts on a regular basis, make lewd comments about the size of his workers' breasts, fondle his employees, dirty dance with employees and make comments about how his coworkers would look if they were wearing a bikini on a frequent and regular basis. The plaintiffs contend that the defendant's arguments are premised upon Tomoson's testimony at trial, and essentially would require this court to make a credibility determination, a determination that is inappropriate under Rule 50(b)'s heightened standards.  Thus, the plaintiffs contend they have sufficiently proved the work environment at Aramark was objectively hostile.  In addition, the plaintiffs contend the defendant is not entitled to rely upon the *Ellerth/Faragher* affirmative defense because both Lopez and Villalpando were subjected to an adverse employment action.  Alternatively, even if the defendant is entitled to assert this defense, the plaintiffs assert the defendant has not met its burden of proof.  Rather, the plaintiffs argue that the jury was entitled to disregard Aramark's evidence in support of the two elements of its affirmative defense—that it exercised reasonable care to prevent and correct any sexual harassment and the plaintiffs unreasonably failed to take advantage of the employer's corrective opportunities.  The plaintiffs highlight the fact that no one in the Sioux City Aramark plant was trained specifically on sexual harassment in the workplace.  Further, Wisecup did not know who was responsible for such training at the Sioux City plant.  In addition, the plaintiffs contend they tried to take advantage of Aramark's corrective opportunities by making Tomoson aware his conduct was offensive.  Further, Villalpando contends she complained to Wisecup on numerous occasions and called the 1-800 hotline, but to no avail.  As such, the plaintiffs argue the defendant failed to prove its *Ellerth/Faragher* affirmative defense.

With respect to their claims under the ICRA, the plaintiffs first argue that since their

respective damages awards are beneath Title VII's cap on damages, no damages need to be allocated to their Iowa claims. Nevertheless, the plaintiffs assert their Iowa claims are meritorious for the same reasons as their federal claims. With respect to the final element of a hostile environment claim under Iowa law—whether the defendant knew or should have known of the harassment and failed to take prompt action—the plaintiffs argue Wisecup knew or should have known of the harassment based upon Villalpando's repeated complaints and his presence during and observation of some of the offending conduct. Accordingly, the plaintiffs contend judgment as a matter of law should not be entered with respect to their claims under the ICRA.

The plaintiffs further contend the damages awarded by the jury are supported by the evidence. Specifically, with respect to the emotional distress damages awarded by the jury, the plaintiffs assert that expert testimony is not a prerequisite to an award of emotional distress damages. Both plaintiffs argue they testified with specificity with respect to the symptoms that resulted from the hostile environment and retaliation. Both plaintiffs experienced depression and crying spells. Villalpando's father testified she became anxious, kept ending up in the hospital and was sick a lot. Likewise, Lopez's counselor, Kreimheld Oudheusden, testified at length regarding how the environment at Aramark aggravated her depressive disorder and post-traumatic stress disorder. This evidence is sufficient, aver the plaintiffs, to support their respective awards of emotional distress damages.

With respect to Villalpando's back pay award, Villalpando argues that Aramark's assertions fail to recognize that she is entitled to lost wages and benefits for the time frame between the date she was constructively discharged and the date she commenced her new employment. In light of the fact Villalpando did not secure such employment until almost one year after she was discharged from Aramark, Villalpando contends the award of back

pay should be affirmed.

Finally, the plaintiffs assert their respective punitive damages awards should be sustained. The plaintiffs first argue the evidence unequivocally establishes Tomoson's managerial capacity. Tomoson had the ability to hire, and although he "technically" lacked the ability to fire, there is no evidence in the record Wisecup did anything more than rubber-stamp Tomoson's recommendations as to termination of employees. Second, the plaintiffs argue Tomoson acted with sufficient malice or reckless indifference. They assert Tomoson was aware his actions were unwelcome, and that he continued to subject them to harassing conduct and punished them for not being willing participants. Additionally, the evidence indicates that Wisecup knew of the harassment based upon Villalpando's complaints and that he failed to act. Further, Villalpando's complaints to the 1-800 hotline were also never investigated. Additionally, the plaintiffs contend Aramark's good faith defense fails. They point out that Tomoson had never been given any specific training on sexual harassment and was unsure if there was a policy and that Wisecup had likewise received very little training on sexual harassment. Further, although the 1-800 hotline video was shown, the plaintiffs contend the words "sexual harassment" were never mentioned and that it was shown on a small television set and that employees were talking throughout the video. Further, the video was shown only in English, even though many employees were only able to understand and speak Spanish. Finally, the plaintiffs contend that even if Aramark's policies and procedures were sufficient, there was a lack of good faith on the part of Aramark in following and implementing the established procedures. As a result, the plaintiffs assert Aramark cannot avoid liability for punitive damages through reliance on the good faith defense.

The plaintiffs further argue Aramark is not entitled to a new trial or remittitur of any of the amounts awarded. With respect to the punitive damages, the plaintiffs assert

the award was reasonable in light of the evidence. Additionally, in light of the reprehensible nature of Aramark's conduct and the fact the award was within the statutory cap for damages in a Title VII case, the plaintiffs argue the award does not violate due process. With respect to the compensatory damages, the plaintiffs simply reassert their arguments outlined above, namely, that sufficient evidence was proffered to support the awards. Finally, with respect to the defendant's motion for a new trial, the plaintiffs contend that after a review of all the evidence, a new trial is not appropriate. The plaintiffs point out that Villalpando was cross-examined at length regarding the inconsistency between her trial testimony and her deposition testimony and she did not recant her trial testimony and explained the reasons for her differing responses. Thus, this fact alone, argue the plaintiffs, should not cause the court to be left with a definite and firm conviction that the jury erred.

### 3. *The defendant's reply*

The defendant limits its reply solely to the discussion of the award of punitive damages to the plaintiffs. The defendant reiterates its arguments that the plaintiffs cannot prove Tomoson served in a managerial capacity and that, therefore, punitive damages cannot be imputed to Aramark as a result. The defendant contends that although Tomoson was a supervisor, it does not necessarily follow that he served within a managerial capacity or had enough authority to impute liability to Aramark. The defendant relies heavily on an Eleventh Circuit case, *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317 (11th Cir. 1997), a pre-*Kolstad* case, for the proposition that punitive damages cases must be placed in context based on the size of the company and the responsibilities of the employee involved. Thus, in a corporation of Aramark's size, the defendant contends Tomoson cannot be said to have served in a managerial capacity because he was not high enough in Aramark's corporate hierarchy.

Second, the defendant reasserts its arguments that the plaintiffs failed to establish Aramark acted with malice and/or reckless indifference.  The defendant asserts the first complaint it received about Tomoson's conduct was after Lopez had been terminated and she filed a complaint with the grievance.  To bolster its argument, the defendant emphasized the fact that Tomoson had never before been the subject of a sexual harassment complaint.  Thus, the defendant contends there was nothing inappropriate about Aramark's conduct.  Further, the defendant appears to assert that Tomoson's conduct did not rise to the requisite level of malice or reckless indifference.

Finally, in the event the punitive damages are not set aside as a matter of law, the defendant argues a new trial should be ordered by the court to avoid a miscarriage of justice.  The defendant reasserts its contentions that plaintiffs' counsel allowed Villalpando to testify she complained about the harassment during her employment at Aramark, despite her response on her ICRC questionnaire that she did not complain to anyone.  The defendant contends in determining whether to order a new trial to avoid a miscarriage of justice, the trial court can rely on its own reading of the evidence.  Taking into account all of the information, the defendant asserts the only reasonable conclusion that can be arrived at is that Villalpando testified falsely.  Accordingly, the defendant urges the court to grant a new trial on both the issue of liability and damages and with respect to both plaintiffs based on the interrelationship between their claims.

## B. Motion For Judgment As A Matter Of Law

### 1. Standards for judgment as a matter of law

Rule 50(a) of the Federal Rules of Civil Procedure provides for entry of judgment as a matter of law during trial if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Fed. R. Civ. P.* 50(a). Rule 50(b) provides for renewal of such a motion after trial, as follows:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
> > (1) if a verdict was returned:
> > > (A) allow the judgment to stand,
> > > (B) order a new trial, or
> > > (C) direct entry of judgment as a matter of law;
> > or
> > (2) if no verdict was returned;
> > > (A) order a new trial, or
> > > (B) direct entry of judgment as a matter of law.

*Fed. R. Civ. P.* 50(b). Aramark made motions for judgment as a matter of law in the course of trial, then filed its renewed motion for judgment as a matter of law on November 21, 2005 (Doc. No. 68). Therefore, Aramark's motion for judgment as a matter of law is controlled by Rule 50(b). Moreover, because a verdict was returned on each of the issues on which Aramark has moved for judgment as a matter of law, the options before

the court are those stated in Rule 50(b)(1).

The Eighth Circuit Court of Appeals recently stated the following standards for a Rule 50(b) post-verdict motion for judgment as a matter of law:

> We review de novo the district court's denial of [a] post-verdict motion for judgment as a matter of law." *Racicky v. Farmland Indus., Inc.,* 328 F.3d 389, 393 (8th Cir. 2003). We are required to decide whether or not the record contains evidence sufficient to support the jury's verdict. *Id.* In doing so, "we must examine the sufficiency of the evidence in the light most favorable to [the prevailing party] and view all inferences in [its] favor." *Id.* (citation omitted). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining [the prevailing party's] position." *Id.* (citation omitted).

*Children's Broad. Corp. v. Walt Disney Co.,* 357 F.3d 860, 863 (8th Cir. 2004); *see Top of Iowa Co-op. v. Schewe,* 324 F.3d 627, 633 (8th Cir. 2003) ("'Post-verdict judgment as a matter of law is appropriate only where the evidence is entirely insufficient to support the verdict.'") (quoting *Belk v. City of Eldon,* 228 F.3d 872, 878 (8th Cir. 2000); *Foster v. Time Warner Entm't Co.,* 250 F.3d 1189, 1194 (8th Cir. 2001) ("Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party.") (internal quotation marks and citations omitted); *Children's Broad. Corp. v. Walt Disney Co.,* 245 F.3d 1008, 1015 (8th Cir. 2001) ("Judgment as a matter of law [post-trial] is warranted only when all the evidence points in one direction and no reasonable interpretations support the jury's verdict."); *Tatom v. Georgia-Pacific Corp.,* 228 F.3d 926, 931-32 (8th Cir. 2000) (articulating similar standards, noting that "'[t]his demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the

jury's rightful province'" and that "[a] jury's verdict should not be lightly set aside, but in this case our duty is to do so") (quoting *Gardner v. Buerger,* 82 F.3d 248, 251 (8th Cir. 1996)); *Belk*, 228 F.3d at 877-78 (articulating similar standards and noting, *inter alia,* that "[p]ost-verdict judgment as a matter of law is appropriate only where the evidence is entirely insufficient to support the verdict").  Thus, this standard requires the court to:

> "[C]onsider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Cmty. Dev. Agency*, 928 F.2d at 301 (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 989 (8th Cir. 1989)); *see also Stephens v. Johnson,* 83 F.3d 198, 200 (8th Cir. 1996) (citing *Whitnack v. Douglas County*, 16 F.3d 954, 956 (8th Cir. 1994), in turn, quoting *Hastings v. Boston Mut. Life Ins. Co.*, 975 F.2d 506, 509 (8th Cir. 1992)); *Haynes v. Bee-Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir. 1996); *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 800 (8th Cir. 1994) (reiterating these factors) (citing *White v. Pence,* 961 F.2d 776, 779 (8th Cir. 1992)); *McAnally v. Gildersleeve,* 16 F.3d 1493, 1500 (8th Cir. 1994) (same).  This standard for consideration of a motion for judgment as a matter of law accords the jury's verdict substantial deference.  *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806 (8th Cir. 1994); *McAnally,* 16 F.3d at 1500. However, despite the amount of deference accorded to the jury's verdict, the jury cannot be accorded "the benefit of unreasonable inferences, or those 'at war with the undisputed facts,'" *McAnally,* 16 F.3d at 1500 (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha,* 883 F.2d 650, 651 (8th Cir. 1989), in turn, quoting *Marcoux v. Van*

*Wyk,* 572 F.2d 651, 653 (8th Cir. 1978)), but the court must still defer to the jury's resolution of conflicting testimony. *Jackson v. Virginia,* 443 U.S. 307, 326 (1979); *Schewe,* 149 F. Supp. 2d at 716. Thus, the Eighth Circuit Court of Appeals has also explained that "'[a] mere scintilla of evidence is inadequate to support a verdict,' and judgment as a matter of law is proper when the record contains no proof beyond speculation to support the verdict." *Clark v. Kan. City Miss. Sch. Dist.,* 375 F.3d 698, 701 (8th Cir. 2004) (quoting *Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (*en banc*)).

With these concepts in mind, the court turns to each of the four grounds in which the defendant contends it is entitled to judgment as a matter of law: (1) the plaintiffs' harassment and retaliation claims; (2) the plaintiffs' claims for emotional distress damages; (3) Villalpando's claim for backpay damages; and (4) the plaintiffs' claims for punitive damages.

## 2. *Federal and Iowa law claims*

Before addressing the merits of the parties' respective arguments, it is important to note that the plaintiffs premised their claims of retaliation and hostile work environment sexual harassment under both federal law pursuant to Title VII and state law, pursuant to the Iowa Civil Rights Act ("ICRA"). This court has previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." *Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)). This is so, because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See id.* at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was

modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims. *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between Title VII and the ICRA becomes critical, the court will analyze the plaintiffs' state and federal retaliation and hostile environment claims together using federal precedent.

### 3. The retaliation claims

The Eighth Circuit Court of Appeals recently reiterated that, post-*Desert Palace, Inc. v Costa*, 539 U.S. 90 (2003), the courts must still apply the *McDonnell Douglas* three-part burden-shifting analysis to retaliation claims. *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017-18 (8th Cir. 2005) (holding that *Desert Palace* had no impact on the applicability of the burden-shifting analysis to either retaliation or discrimination claims); *see also Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005) (applying the burden-shifting analysis to a retaliation claim); *Kratzer v. Rockwell Collins, Inc*, 398 F.3d 1040, 1048 (8th Cir. 2005) (same). Thus, "[t]o make a prima facie case of retaliation against an employer, a claimant must show that (1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Elisero*, 398 F.3d at 1078-79; *Kratzer*, 398 F.3d at 1048; *accord Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1035 (8th Cir. 2005) ("To state a retaliation claim, a plaintiff must show that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the two events are causally connected."). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to

offer a non-retaliatory reason for alleged retaliation, and if the employer does so, the plaintiff must show that the proffered reason is a pretext for retaliation. *Elisero*, 398 F.3d at 1078-79; *Kratzer*, 398 F.3d at 1048 ("Once the prima facie case is made, [the employer] must articulate a legitimate, nondiscriminatory reason for its actions," and if the employer does so, then "[t]he burden shifts to [the employee] to establish that the alleged legitimate, nondiscriminatory reason for [adverse action] was a pretext."). As to pretext, the question is whether a reasonable jury could find the defendant's explanation to be a mere pretext for retaliation in light of the evidence presented. *Elisero*, 398 F.3d at 1078-79. Here, however, Aramark argues first that the plaintiffs' retaliation claims must fail because neither Lopez nor Villalpando established the elements of a prima facie case at trial.

### a. Failure to engage in protected activity

First, the defendant contends neither plaintiff engaged in a requisite "protected activity." The plaintiffs maintain they both "engaged in the 'most basic form of protected activity' when [they] told [Tomoson] to stop his offensive conduct." *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (citing *Quarles v. McDuffie County*, 949 F. Supp. 846, 853 (S.D. Ga. 1996)). This court finds that judgment as a matter of law is not warranted on this ground. Taking the evidence in a light most favorable to the plaintiffs, as this court is required to do, the jury could have reasonably concluded both Lopez and Villalpando voiced objections to Tomoson about his conduct.

With respect to Lopez, she testified she would give Tomoson dirty looks and walk away when he started telling dirty jokes or talking about breasts or the bikinis. She further stated, "Hey, hey, hey," when Tomoson hit her buttocks with a paper bag while she was bending over. On another occasion, she indicated to Tomoson that she was there "to work, not to play," and told him "Don't," after he pinched her on the hip. Finally, on the Friday before she was terminated, Lopez refused to dance with Tomoson, and voiced

objections to her coworkers' comments. Upon seeing Tomoson dancing behind her, she screamed. She told her coworkers she wasn't like them and that she didn't like "that." These comments, although based off Lopez's testimony, are sufficient to demonstrate she engaged in a protected activity by opposing Tomoson's discriminatory conduct by indicating her objections to Tomoson's conduct.

With respect to Villalpando, she testified that after Tomoson attempted to "dirty dance" with her, she turned around angrily and told him not to be doing that. Villalpando also indicated that she repeatedly told Tomoson to not talk about her breasts. Additionally, after Tomoson touched her breasts, Villalpando got mad at Tomoson. Furthermore, Villalpando testified she called the 1-800 hotline to report Tomoson's conduct and that she repeatedly voiced her complaints to Wisecup and Freeman. Although Aramark contends this testimony contradicts the testimony of Villalpando's deposition where she testified she didn't remember if she complained, and her ICRC questionnaire, on which she indicated she did not complain to anyone because she was afraid of Tomoson's response, it is not within the province of this court on a post-trial motion for judgment as a matter of law to weigh the evidence. Rather, the court must view the evidence in a light most favorable to the verdict, and on these facts, it is clear that Villalpando engaged in protected activity by voicing her objections not only to Tomoson, but also to Wisecup, Freeman and the corporate hotline. Thus, judgment as a matter of law is not warranted upon this ground with respect to either plaintiff. To accept the defendant's argument and conclude otherwise would necessarily require this court to weigh the conflicting testimony in the case, an analysis that would be wholly inappropriate on renewed motion for judgment as a matter of law.

### b.    Failure to prove adverse employment action

The defendant also asserts both plaintiffs failed to prove an adverse employment action was taken against her.  Specifically, Aramark contends the allegations by the plaintiffs that they were assigned more difficult job duties are insufficient to carry the day with respect to this aspect of the plaintiffs' retaliation claims.  Unfortunately, the defendant's argument overlooks the obvious.  While the defendant correctly asserts that "not everything that makes an employee unhappy is an actionable adverse action,"*see Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997), here, Lopez was discharged—an unequivocal and obvious instance of an adverse employment action.  *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) ("Typically, it is obvious whether an employer took adverse employment action when, for example, the employee has been terminated or discharged."); *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995) ("Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation."); *see also Delashmutt v. Wis-Pak Plastics, Inc.*, 990 F. Supp. 689,  696 (N.D. Iowa 1998) (quoting *West*).

Villalpando's theory of the case at trial was that she was constructively discharged.  As the United States Court of Appeals for the Eighth Circuit has explained, "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation.  *West*, 54 F.3d at 497; *see also Delashmutt*, 990 F. Supp. at 696 (quoting *West*).  To prove a constructive discharge, the plaintiff must prove that her employer rendered the employee's working conditions intolerable, forcing the employee to quit.  *See Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 354 (8th Cir. 1997); *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir. 1997).  "Behavior that can be characterized as 'merely offensive' is not actionable, but 'a tangible

psychological injury' on the part of the employee is not required for the employer's behavior to be illegal." *Delph*, 130 F.3d at 354 (quoting *Harris*, 510 U.S. at 21). If the plaintiff is to succeed on such a claim, the conduct complained of must have been "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Id.* (quoting *Harris*, 510 U.S. at 21). Furthermore, the environment must be perceived subjectively by the victim as hostile, or the conduct cannot be said to have "actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* (quoting *Harris*, 510 U.S. at 21-22) (citing *Kimzey*, 107 F.3d at 573).[9] The Eighth Circuit has held that "the employer's actions leading to the decision to quit must have been deliberate, and "taken with the intention of forcing the employee to quit." *Id.* (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981)). In the alternative, where conscious intent is absent, the intention element may nevertheless be satisfied by proof demonstrating the employee's "resignation was a reasonably foreseeable consequence" of the hostile atmosphere of the plaintiff's workplace. *Id.* (citing *Hukkanen v. Int'l Union of Operating Eng'rs Local 101*, 3 F.3d 281, 285 (8th Cir. 1993)). Taking the evidence in the light most favorable to Villalpando, it is with little difficulty that this court concludes Villalpando met her burden, under either a conscious intent standard or a reasonably foreseeable consequence standard. First, there is no doubt, based on Villalpando's testimony at trial that she subjectively perceived the environment to be abusive. Further, in light of the testimony of the two plaintiffs, the evidence supports, if not compels, the conclusion that the environment was also objectively hostile or abusive. The conduct complained of by

---

[9]This standard, although given a cursory overview in this section, will be expounded upon during the court's discussion of the plaintiffs' sexually hostile work environment claim.

the plaintiffs was pervasive, in that it occurred on almost a daily basis and involved physical sexual touching, leering and rude and offensive comments and jokes made by Villalpando's supervisor. Furthermore, Villalpando was shunned, criticized, ostracized and ridiculed at the hands of coworkers, in addition to being physically assaulted on two occasions. A reasonable person would find such an environment intolerable, abusive and hostile. Second, Tomoson's assurance to Espinoza and Coronado after Villalpando's call to the 1-800 hotline that they were not to worry because he had plans for Villalpando, is highly indicative of a conscious intent to force Villalpando to resign. Alternatively, given the extremely abusive environment at Aramark, whereby Tomoson refused to assign her light duty in accordance with her doctor's notes, the pervasive sexual conduct by Tomoson and the actual physical altercations that were occurring at the hands of her coworkers, sufficient evidence was presented for a jury to conclude that Villalpando's resignation was a reasonably foreseeable consequence of such an environment. For all of these reasons, Villalpando presented sufficient evidence that she was constructively discharged—an undisputed form of an adverse employment action. *West*, 54 F.3d at 497; *see Spears v. Miss. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 n. 3 (8th Cir. 2000) ("a constructive discharge may constitute an adverse employment action"); *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999) ("Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard [of an adverse employment action under Title VII], *see* [*Cross v.*] *Cleaver*, 142 F.3d [1059,] 1073 [(8th Cir. 1998)], as would circumstances amounting to a constructive discharge, *see Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 732 (8th Cir. 1996)."); *see also Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) (acknowledging that the Second Circuit Court of Appeals had held that "'when a constructive discharge is found, an employee's resignation is treated . . . as if the

employer had actually discharged the employee'") (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987)); *Delashmutt*, 990 F. Supp. at 696 (quoting *West*, 54 F.3d at 497).

While Lopez's discharge and Villalpando's constructive discharge are sufficient proof, in and of themselves, of an adverse employment action, the court feels compelled to comment further on the defendant's constrained view of the case and the law. Although the defendant recognizes that "actions short of termination may constitute an adverse employment action within the meaning of [42 U.S.C. § 2000e-3(a)], *Kim*, 123 F.3d at 1060, the defendant appears to suggest that the plaintiffs may only rely upon their allegations that they were assigned more difficult job assignments. This statement is inherently inaccurate because the Eighth Circuit has recognized that a factfinder "may examine the cumulative effect of the employer's allegedly retaliatory actions, rather than determining whether any individual action upon which the claim relies was sufficiently adverse." *Id.*; *see also Cherry v. Menard, Inc.*, 101 F. Supp. 2d 1160, 1185-68 (N.D. Iowa 2000). Thus, the plaintiffs were not required to prove the different job assignments meted out to them, in and of themselves, resulted in a materially significant disadvantage to the plaintiffs, as the defendant avers. Rather, the plaintiffs could rely on these allegations, in addition to the other retaliatory conduct contained in the record. For example, Villalpando alleged Tomoson refused to give her light duty in accordance with her doctor's notes and refused to let her explain her injury. Lopez testified that Tomoson would hang up the phone when she tried to call into work. Further, both plaintiffs were ostracized, shunned and demeaned by their fellow coworkers. Although the court is cognizant that the United States Court of Appeals for the Eighth Circuit has held that general allegations of coworker ostracism are, without more, insufficient to rise to the level of an adverse employment action for purposes of Title VII, s*ee Scusa v. Nestle*

*U.S.A. Co.*, 181 F.3d 958, 969-70 (8th Cir. 1999), this fact is of little consequence to the plaintiffs for two reasons. First, the plaintiffs, particularly plaintiff Villalpando, have asserted much more than general "ostracism" or "shunning" by their fellow coworkers. For example, the record reveals that the coworkers cursed at and made fun of Villalpando by calling her "Chuckie with the big boobs." She was assaulted at work by two coworkers who scratched her. On another occasion, she was pushed and sustained a back injury severe enough to require a visit to the hospital and light duty restrictions. Lopez witnessed and overhead many, if not most, of these incidents. Second, in light of the evidence presented at trial, the plaintiffs have more than the behavior of their coworkers to support their claims of retaliation. Rather, the plaintiffs presented proof at trial of a wide variety of retaliatory conduct also meted out by Tomoson. The cumulative effect of Tomoson's retaliatory actions, as buttressed by the other coworkers' extreme conduct, is sufficient proof that Lopez and Villalpando suffered an adverse employment action, regardless of their respective terminations. *See Cherry*, 101 F. Supp. 2d at 1186 (determining the plaintiff could rely on the cumulative effect of her supervisor's and coworkers' retaliatory conduct in order to support her claim of an adverse employment action). For all these reasons, the defendant's argument, in this aspect, must fail.

### c.      *Failure to prove causal connection*

Although the defendant does not specifically challenge causation, to the extent the defendant's brief may imply such an argument, this court notes both plaintiffs presented sufficient evidence of a causal connection between the protected activity and the adverse employment action. Both plaintiffs presented evidence that their coworkers who did not oppose Tomoson's conduct were treated differently than the plaintiffs. The coworkers who did not object to Tomoson's conduct received highly favorable treatment from him—they were assigned to easier job duties and allowed to take extended breaks. Additionally, these

38

employees were allowed to come in late, leave early and were not disciplined. Further, Tomoson said to Lopez, "See, look how easy you could have it," when she was assigned to an easy job duty. Upon Lopez's refusal to acquiesce, he promptly reassigned her to a harder job. In addition, Tomoson indicated to Espinoza and Coronado that "he had plans for Maricela" following her call to the 1-800 hotline. These facts are sufficient proof of a causal connection between the adverse employment actions taken by the defendant and the engagement by the plaintiffs in a protected activity.

### d.      *Proffer of legitimate, nondiscriminatory reason and pretext*

The defendant next argues, that even if Lopez established a prima facie case of retaliation, it proffered a legitimate, nondiscriminatory reason for its actions and that Lopez utterly failed to prove Aramark's proffered reason was a pretext for illegal retaliation. This court disagrees. Although Lopez missed 21 days of work in her four-month tenure at Aramark, in light of Tomoson's conduct and comments, a jury could have easily concluded that had Lopez acquiesced to Tomoson's harassment, she would not have been terminated. Her testimony was that the coworkers who voiced no objections to Tomoson's conduct were allowed to miss work, come in late, leave early and were not reprimanded. Further, the evidence presented at trial reveals that Tomoson had a history of repeatedly retaliating against Lopez for her objections throughout her employment with Aramark, which ultimately culminated in her termination. Given this history and Tomoson's course of conduct, Lopez offered sufficient evidence of pretext. Accordingly, the defendant's motion for judgment as a matter of law, with respect to both plaintiffs' retaliation claims is **denied**.

### 3.    *The hostile work environment sexual harassment claims*

As the Eighth Circuit Court of Appeals has repeatedly explained, to establish a prima facie case of sexual harassment, a plaintiff must show the following:  (1) he or she was a member of a protected group, that is, male or female; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for imposing liability on the employer for harassment.  *Kratzer*, 398 F.3d 1040, 1047 (8th Cir. 2005); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. ), *cert. denied*, 126 S. Ct.  769 (2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004).  In the case of co-worker harassment, the fifth element requires a showing that the employer "knew or should have known of the harassment and failed to take proper remedial action." *Kratzer*, 398 F.3d at 1047; *Pedroza*, 397 F.3d at 1068; *Erenberg*, 357 F.3d at 792. However, where the alleged harassment was by a supervisor, as is the case here, employer liability is analyzed under the standards set forth by the Supreme Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  *McCurdy v. Ark. State Police*, 375 F.3d 762, 770 (8th Cir. 2004), *cert. denied*, 543 U.S. 1121 (2005).  The Eighth Circuit recently explained the *Ellerth/Faragher* standards for employer liability for harassment by a supervisor as follows:

> [T]he Court announced its holding [in *Ellerth* and *Faragher*]:  An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, which comprises two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. [*Ellerth*], [524 U.S.] at 764-65, 118 S. Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S. Ct 2275. The Court accentuated that "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765, 118 S. Ct. 2257; *Faragher*, 524 U.S. at 808, 118 S. Ct. 2275; *see also Pa. State Police v. Suders*, 542 U.S. 129, 124 S. Ct. 2342, 2352, 159 L. Ed. 2d 204 (2004) (recognizing *Ellerth* and *Faragher*, which govern employer liability for supervisor sexual harassment, "delineate[d] two categories of hostile work environment claims: (1) harassment that 'culminates in a tangible employment action,' for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense") (citation omitted).

*McCurdy*, 375 F.3d at 770. It is undisputed that Tomoson was the plaintiffs' supervisor. Accordingly, the court will utilize the *Ellerth/Faragher* model to analyze the parties' respective arguments.

### a.   Actionable harassment

The element of the prima facie case that is principally in dispute here is the fourth one, whether the harassment affected a term, condition, or privilege of employment, i.e., whether the harassment is "actionable." The United States Court of Appeals for the Eighth Circuit has explained that this element requires "a twofold inquiry." First, the harassment must be "sufficiently severe or pervasive to create an 'objectively hostile' work environment." *Kratzer*, 398 F.3d at 1047 (citing *Henthorn v. Capital Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004)). Second, the victim must subjectively perceive the environment as abusive, otherwise the conduct has not altered the conditions of

employment. *Id.* (citing *Harris*, 510 U.S. at 21-22). The prongs of this inquiry require some deeper consideration in this case.

As to the first prong of the inquiry, whether or not the environment was "objectively hostile,"

> [the environment] must be more than merely offensive, immature or unprofessional; it must be extreme. *Id.* at 1027 (citing *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). Conduct that does not exceed the threshold of severity is insufficient to create a prima facie case of sexual harassment. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999).

*Id.* To put it another way,

> "Sexual harassment 'standards are demanding--to be actionable, conduct must be extreme and not merely rude or unpleasant.'" *Tuggle* [*v. Mangan*], 348 F.3d [714,] 720 [ (8th Cir. 2003) ] (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). "'More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.'" *Id.* (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). [The plaintiff] must prove [her] workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

*LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1101-02 (8th Cir.), *cert. denied*, 126 S. Ct. 335 (2005). Determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *See Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) (citing *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). Although a single offensive utterance or exposure to distasteful conduct

ordinarily does not rise to the level of a Title VII violation, *see Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997), there is no "rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment." *Moring*, 243 F.3d at 456. Thus, "[w]hether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Eliserio*, 398 F.3d at 1076; *LeGrand*, 394 F.3d at 1102 (enunciating the same factors).

As to the second prong of the inquiry, whether or not the environment was "subjectively hostile," "'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (quoting *Harris*, 510 U.S. at 21); *see Kratzer*, 398 F.3d at 1047 (also citing *Harris*). "[A]n employee's admission that [the environment] was not abusive is fatal to the employee's Title VII sexual harassment claim." *Kratzer*, 398 F.3d at 1047 (citing *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355 (8th Cir. 1997); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)).

Essentially, the defendant only contests the sufficiency of the plaintiffs' proof with respect to the first prong of the inquiry—that is, whether the environment complained of by the plaintiffs was objectively hostile. Presumably, this is so because the plaintiffs' own testimony at trial unquestionably establishes that both Lopez and Villalpando perceived their environment as subjectively hostile. Accordingly, the court will hone its discussion in on this first prong of the inquiry. The defendant asserts that the plaintiffs' recitation of the allegations are "at worse, evidence of boorish but not actionable behavior by Mr.

Tomoson." Defendant's Brief, at 59. As such because Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," the defendant contends judgment as a matter of law must be entered on its behalf. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The plaintiffs submit that the defendant's argument downplays their testimony and that in order to accept the defendant's argument, it would require a credibility determination on the part of this court. This court agrees. Giving the plaintiffs the benefit of all reasonable inferences and resolving any factual conflicts in their favor, the court concludes the evidence produced by the plaintiffs was sufficient to support the jury's verdict in their favor. Based on the plaintiffs' testimony, it is clear that Tomoson's conduct was unquestionably pervasive and likely rose to an actionable level of severity as well. Tomoson's conduct involved much more than simple "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788. Lopez testified that Tomoson would leer at her breasts three out of the five days of the work week and that he would talk about the bikini and coworkers wearing the bikini every Thursday. Tomoson physically touched Lopez in an inappropriate manner by hitting her on the buttocks and pinching her. He attempted to "dirty dance" behind her. Additionally, Lopez testified that Tomoson was "always hanging around the irons," touching coworkers, telling jokes, dirty dancing and making comments about breasts. Often, he picked coworkers up and shook them so he could watch their breasts move. Similarly, Villalpando testified Tomoson would "very often" talk about her breasts and that he was "always" playing, telling jokes and referring to breasts. Like Lopez, Villalpando observed Tomoson "dirty dance" behind coworkers and pick them up and shake them so he could watch their breasts move. Tomoson also attempted to dirty dance behind Villalpando. He repeatedly told Villalpando she had big

breasts and told her how she would look in a bikini with her "big boobs." In addition, Tomoson physically touched Villalpando in an inappropriate way when he touched her breasts while attempting to lift her up and shake her. Furthermore, the plaintiffs were not only harassed by Tomoson, but also suffered frequent ridicule, criticism and ostracism at the hands of their coworkers who went along with Tomoson's activities. Eventually, the workplace friction that resulted from Tomoson's conduct led to the physical assault of Villalpando by her coworkers on two distinct occasions, one of which she sustained scratches and another in which she sustained a back injury requiring a hospital visit and light duty restrictions. A reasonable person would have little, if any at all, hesitation in finding that these incidents, taken collectively, were both severe and pervasive enough so as to alter a term, condition, or privilege of the plaintiffs' employment. Accordingly, judgment as a matter of law is not warranted on this ground.

### b. Applicability of the Ellerth/Faragher affirmative defense

Aramark contends that it is entitled to raise this affirmative defense because neither plaintiff suffered a tangible employment action.[10] This argument is without merit. In *Burlington Industries, Inc. v. Ellerth* and *Faragher v. City of Boca Raton*, the United States Supreme Court clarified the employer liability standard for supervisory harassment of an employee under Title VII as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see Fed. R. Civ. P.* 8(c). The defense comprises

---

[10]Aramark does not contest that Tomoson qualified as a supervisor, thereby implicating the *Ellerth/Faragher* vicarious liability model.

two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. As this court stated in *Green v. The Servicemaster Co.*, 66 F. Supp. 2d 1003 (N.D. Iowa 1999), the threshold question for employer liability for supervisor harassment, is whether the plaintiff-employee suffered a tangible employment action. *See id.*; *see also Cherry*, 101 F. Supp. 2d at 1171. If a supervisor's alleged sexual harassment of an employee culminates in "a tangible employment action such as discharge, demotion, or undesirable reassignment, the employer is vicariously liable to the employee." *Newton v. Cadwell Labs.*, 156 F.3d 880, 883 (8th Cir. 1998) (citing *Ellerth* and *Faragher*). If no tangible employment action is taken, the defending employer may raise the two prong affirmative defense subject to proof by a preponderance of the evidence. *See Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

Here, Aramark argues that the plaintiffs did not suffer any tangible employment action. However, the evidence presented at trial demonstrated that Lopez was terminated and Villalpando was constructively discharged in retaliation for their failure to acquiesce in, and resistance to, Tomoson's conduct. In *Cherry*, this court concluded that a constructive discharge, like any other discharge resulting from sexually harassing conduct of a supervisor, constitutes a tangible employment action within the meaning of the *Ellerth/Faragher* standard, and therefore deprives the employer of the affirmative defense to vicarious liability. *Cherry*, 101 F. Supp. 2d at 1171-1174. Accordingly, because both plaintiffs proffered sufficient proof that they suffered a tangible employment action, Aramark is precluded from relying upon the *Ellerth/Faragher* affirmative defense in its

motion for judgment as a matter of law.

### c. *Iowa law*

As mentioned previously in this opinion, the plaintiffs' state law claims under the ICRA are analyzed in essentially the same way as their federal law claims under Title VII. Retaliation claims under the ICRA are evaluated utilizing the same standards as federal retaliation claims. *Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1178 (N.D. Iowa 2003); *Hulme*, 449 N.W.2d at 633. Thus, to the extent the defendant reasserts its arguments for judgment as a matter of law on plaintiffs' federal claims, the court rejects these arguments under Iowa law as well for the same reasons. Likewise, a sexually hostile work environment claim under Iowa law is analyzed the same as under federal law. However, relying upon this court's opinion in *Stricker v. Cessford Constr. Co.*, 179 F. Supp. 2d 987, 1015 (N.D. Iowa 2001), the defendant contends there is one major difference between the federal and state analytical schemes—namely, that the Iowa Supreme Court has never adopted the *Ellerth/Faragher* model for vicarious liability of an employer for supervisor harassment. Instead, the defendant contends the plaintiffs are required to prove a fifth element under their state law claims: The employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. *See Stricker*, 179 F. Supp. 2d at 1015; *see also Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 (Iowa 1993); *Lynch v. City of Des Moines*, 454 N.W.2d 827, 833 (Iowa 1990). The plaintiffs appear to concede that the Iowa courts have not yet adopted the *Ellerth/Faragher* model, and argue they proved the requisite fifth element. However, in light of recent Iowa Supreme Court jurisprudence, this court disagrees with both parties. This court will briefly clarify its position with respect to this matter in an attempt to elucidate the state of Iowa law, at least as it is interpreted by this court.

At the time *Stricker* was decided on September 7, 2001, the Iowa Supreme Court

utilized the same model for analyzing employer liability for sexual harassment perpetrated by either a coworker or a supervisor. *See Greenland*, 500 N.W.2d at 38 (stating that, in a case involving harassment by a manager, "in order to establish a claim of sexually hostile work environment harassment, it must prove[d] that . . . the employer knew or should have known of the harassment and failed to take prompt and remedial action"); *Lynch*, 454 N.W.2d at 833 (applying the "knew or should have known standard" to a case involving coworker sexual harassment).[11]  However, since that time, the Iowa Supreme Court issued its opinion in *Farmland Foods, Inc. v. Dubuque Human Rights Commission*, 672 N.W.2d 733 (Iowa 2003).  In *Farmland Foods, Inc.*, the defendant-employer sought review of the Dubuque Human Rights Commission's award of damages to an African-American employee on his hostile work environment claim based on the conduct of his supervisor. There, the Iowa Supreme Court wrote:

> To establish a hostile work environment, the plaintiff must show:  (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the

---

[11]This court notes, however, that in *Greenland*, the issue before the court was whether the plaintiff's claims under the ICRA preempted her common law claims for intentional infliction of emotional distress, assault and battery.  Thus, the Iowa Supreme Court's opinion merely listed the elements of a sexually hostile work environment claim, relying exclusively on *Lynch*, a coworker harassment case.  The opinion did not further discuss or explore the elements of a sexually hostile work environment claim under Iowa law, but rather dealt solely with the preemption issue.  Thus, although *Greenland* does list the fifth element as part of a prima facie case of supervisor harassment under Iowa law, the elements that the plaintiff was required to prove to support her claim were not necessary to the decision of the issues the court faced in *Greenland*, and are properly characterized as dicta as it is likely they were given very little consideration as a result. *See Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986) (defining dictum as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding-that, being peripheral, may not have received the full and careful consideration of the court that uttered it.").

harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment. *See Beard v. Flying J, Inc.*, 266 F.3d 792, 797 (8th Cir. 2001). Additionally, if the harassment is perpetrated by a nonsupervisory employee, the plaintiff must show the employer "knew or should have known of the harassment and failed to take proper remedial action." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000). When a supervisor perpetrates the harassment, but no tangible employment action occurred, the employer may assert the *Faragher-Ellerth* affirmative defense to avoid liability. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

*Farmland Foods*, 672 N.W.2d at 744 (footnote omitted). In a footnote, the Iowa Supreme Court continued:

> If a plaintiff establishes a supervisor effected a tangible work action against the plaintiff, the defendant employer or corporate entity is liable for the harassment. However, if the plaintiff fails to establish that the supervisor took a tangible employment action, the employer may assert the *Faragher-Ellerth* affirmative defense. The employer establishes this defense by showing it: (1) exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Id.* at n.2 (citations and internal quotation marks omitted). Thus, it appears the Iowa Supreme Court now fully follows the *Ellerth/Faragher* model of vicarious liability in

claims involving supervisor harassment. *See id.* Although *Farmland Foods* dealt with a racially hostile work environment claim, there is nothing to suggest the Iowa Supreme Court would apply a different analysis to a sexually hostile work environment claim. This conclusion is reinforced by an even more recent Iowa Supreme Court case, *Boyle v. Alum-Line, Inc.*, ____ N.W.2d ____, No. 04-0677, 2006 WL 566378, at *3 (Iowa Mar. 10, 2006), a case that directly confronted the issue of the elements of a sexually hostile work environment. There, the court stated:

> In *Farmland Foods v. Dubuque Human Rights Commission*, we set forth the elements of an ICRA hostile-work-environment claim:
>
> To establish a hostile work environment, the plaintiff must show: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment. Additionally, if the harassment is perpetrated by a *nonsupervisory employee*, the plaintiff must show the employer knew or should have known of the harassment and failed to take proper remedial action. 672 N.W.2d 733, 744 (Iowa 2003) (internal quotations and citations omitted).

*Boyle*, 2006 WL 566378, at *3 (emphasis added). Thus, although it has not been entirely clear or consistent, it appears that the Iowa Supreme Court now qualifies the fifth element's applicability to only those cases in which the harassment is perpetrated by a nonsupervisory employee and has adopted the *Ellerth/Faragher* model of vicarious liability in the case of harassment meted out at the hands of a supervisory employee. Accordingly, the defendant's argument that the plaintiffs were required to prove a fifth element with respect to their claims under the ICRA is without merit. Rather, the same analysis is applied to the plaintiffs' state law claims as was applied to their federal claims. For precisely the same reasons that the defendant's arguments failed with respect to the

plaintiffs' federal law claims, it follows then that these same renewed arguments also fail with respect to the plaintiffs' state law claims of hostile work environment sexual harassment. Thus, the defendant's request for judgment as a matter of law with respect to the plaintiffs' retaliation and hostile work environment sexual harassment under Iowa law is **denied** in its entirety.

### 4. *The emotional distress damages*

Both plaintiffs were awarded $35,000 in emotional distress damages. In a Title VII case, "[c]ompensatory damages for emotional distress must be supported by 'competent evidence of a genuine injury,' and a plaintiff's own testimony can carry this burden." *Rowe v. Hussman Corp.*, 381 F.3d 775, 783 (8th Cir. 2004) (quoting *Kucia v. Southeast Ark. Cmty. Action Corp.*, 284 F.3d 944, 947 (8th Cir. 2002)); *Bailey v. Runyon*, 220 F.3d 879, 880 (8th Cir. 2000) (same) (citing *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir. 1999)) and (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)). More specifically, "'[m]edical or other expert evidence is not required to prove emotional distress.'" *Bailey*, 220 F.3d at 881 (quoting *Kim*, 123 F.3d at 1065)). What is required is "'evidence of the nature and extent of the emotional harm caused by the alleged violation.'" *Id.* at 880-81 (quoting *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 636 (8th Cir. 1998)). Therefore, the plaintiff is "'required to convince the trier of fact that [she] actually suffered distress because of the [Title VII violation] itself."' *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996)). Also, it is well-settled that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms. *See, e.g., Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir. 1988); *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1299 n.3 (8th Cir. 1987); *Stafford v. Neurological Med., Inc.*, 811 F.2d 470,

475 (8th Cir. 1987); *Vanskike v. Union Pac. R.R. Co.*, 725 F.2d 1146, 1150 (8th Cir. 1984).

Aramark contends neither plaintiff presented sufficient evidence to justify a $35,000 award of emotional distress damages. Specifically, Aramark contends the plaintiffs' testimony was vague and insufficient and that both plaintiffs were having emotional problems prior to their employment at Aramark. Thus, the defendant contends it is unclear whether the harassing conduct was the source of either woman's distress after being terminated. The defendant attempts to compare the current case with the Eighth Circuit's decision in *Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527 (8th Cir. 1999). However, in *Forshee*, the plaintiff did not suffer a physical injury and was not medically treated for any psychological or emotional injury. *Id.* at 531. No other witness corroborated evidence of an outward manifestation of emotional distress. *Id.* Further, the plaintiff found a new job almost immediately, and thus, her termination did not further compound as a result. *Id.* Finally, although the conduct asserted was disgusting, it did not humiliate the plaintiff in front of her coworkers. *Id.* In contrast, in the case currently before the court, Lopez testified at length regarding the depression and anxiety she experienced as a result of Tomoson's conduct. She indicated she would get extremely depressed every Sunday before work. She testified she felt belittled and had low self-esteem and that Tomoson's conduct would bring back memories of her childhood and make things worse. She testified she would get angry, become depressed and start crying. Additionally, Lopez testified she was put on anxiety medication. Further, she indicated that after her termination, although part of her was relieved, she was concerned because she was not going to have the money or the benefits. In addition, Lopez's counselor testified at length regarding how Tomoson's conduct aggravated Lopez's post-traumatic stress disorder. Lopez's therapist testified further that Lopez's major depressive disorder was causally

related to the harassment she endured at Aramark. Similarly, Villalpando testified she was depressed and crying daily because of how Tomoson and her coworkers were treating her. Her depression continued after she left Aramark. She testified she was crying all the time and her bills had started to fall behind because she didn't have any money. She began fighting with her husband because of her job and because she did not have money to help pay for the couples' debt and lifestyle. Jesus Villalpando, Villalpando's father, testified that Villalpando would confide in him the difficulties she was having at Aramark. He indicated she seemed sad and anxious and that she was frequently sick and routinely ended up in the hospital. Angelina Villalpando, Villalpando's sister, testified that Villalpando was always sad and cried a lot. She further indicated Villalpando went from being a generally happy person to one who was always sad and crying. Thus, unlike *Forshee*, both plaintiffs had witnesses corroborate their outward manifestations of emotional distress. Further, in stark contrast to *Forshee*, both plaintiffs suffered considerable emotional distress, including embarrassment, humiliation, personal degredatation and loss of self-esteem due to the environment that existed at Aramark. Finally, both plaintiffs' distress was compounded by the loss of their jobs, especially with respect to Villalpando, due to their respective losses in benefits and pay. This case is clearly inapposite to *Forshee* and the plaintiffs presented more than sufficient evidence to justify an award of $35,000 in emotional distress damages. Similar amounts have been awarded in prior cases. *See, e.g., Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1017 (8th Cir. 1988) (upholding awards of $15,000 and $20,000 for the humiliation and distress of being harassed); *Block v. R.H. Macy & Co.*, 712 F.2d 1241, 1245 (8th Cir. 1983) (upholding $12,402 award for mental anguish, humiliation, embarrassment and stress); *accord. Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1425 (7th Cir. 1986) (upholding an award of $25,000 for the humiliation and distress of being harassed and then fired on racial grounds).

The defendant argues, at least with respect to *Hall v. Gus Construction Co.*, 842 F.2d 1010 (8th Cir. 1988), that the amounts awarded to the plaintiffs in that case—$15,000.00 and $20,000.00—were substantially less than the $35,000 awarded to the plaintiffs. However, the court notes that *Hall* was tried and decided nearly two decades ago. Accordingly, an award of $35,000 almost twenty years later is unquestionably a "similar" award. Indeed, such an award, in the new millennium, could even be considered a modest award in light of cases such as *Rowe v. Hussman Corp.*, 381 F.3d 775, 783 (8th Cir. 2004), where the Eighth Circuit upheld an award of $500,000.00 for emotional distress. The award in *Rowe* was upheld based solely on the plaintiff's testimony about experiencing constant fear of her harasser; having panic attacks characterized by nausea, headaches, sweating, and hyperventilation; being so afraid that she moved to a different home, obtained a gun card, purchased mace, and took to eating lunch and taking coffee breaks in the women's restroom; and the adverse impact her fear had on her relationship with her children. *Id.* Likewise, the Eighth Circuit determined a remitted award of $50,000 was an appropriate award for emotional distress in *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349 (8th Cir. 1997), a racially hostile work environment and constructive discharge case in which evidence similar to the plaintiffs' was proffered. For example, in *Delph*, the plaintiff testified he was emotionally hurt and experienced ulcer-like symptoms and headaches. *Id.* at 357. In addition, the plaintiff's wife testified that her husband was withdrawn and frequently upset. *Id.* Although the Eighth Circuit determined such testimony did not support the original award of $150,000, the court did find the testimony was sufficient to support a remitted award of $50,000. *Id.* at 357-58. The plaintiffs in this case offered as much, and likely a greater, amount of testimony regarding their emotional distress as was presented in *Delph*, and multiple witnesses corroborated both of the plaintiffs' testimony. Accordingly, it is

with little difficulty that this court finds sufficient evidence was presented justifying an award of $35,000 in emotional distress damages to both plaintiffs. Consequently, this court **denies** the defendant's motion for judgment as a matter of law with respect to the plaintiffs' respective awards of emotional distress damages.

### 5. *Villalpando's entitlement to back pay damages*

Title VII, like other federal antidiscrimination laws, supplies broad legal and equitable remedies to make successful plaintiffs whole. 42 U.S.C. § 2000e-5; *see also McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995) (discussing various federal anti-discrimination laws and the means of relief available); *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) (stating that "[t]he 'make whole' purpose of Title VII is made evident by the legislative history"); *Cowan v. Strafford R-VI Sch. Dist.*, 140 F.3d 1153, 1160 (8th Cir. 1998) (acknowledging the court's obligation "to fulfill the make-whole purposes of Title VII"). Among the myriad of remedies available to individuals who prevail on their claims of employment discrimination is an award of back pay. 42 U.S.C. § 2000e-5. "As a general rule, employees are entitled to awards such as back pay and reinstatement only if they were actually or constructively discharged from their employment. *Maney v. Brinkley Mun. Waterworks & Sewer Dep't (Ark.)*, 802 F.2d 1073, 1075 (8th Cir. 1986) (citing *Derr v. Gulf Oil Corp.*, 796 F.2d 340 (10th Cir. 1986); *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 66 & n.8 (5th Cir. 1980)). An award of back pay for a Title VII violation should be based on what the plaintiff would have earned absent the discriminatory practice or conduct, less any amount she could have earned in mitigation. *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) (citing *King v. Staley*, 849 F.2d 1143, 1144-45 (8th Cir. 1988); *Di Salvo v. Chamber of Commerce*, 568 F.2d 593, 597 (8th Cir. 1978)). While a successful plaintiff may be awarded back pay under the broad remedial provisions of Title VII, such a plaintiff must

also make a good faith effort to mitigate such damages. *See Delight Wholesale Co.*, 973 F.2d at 670; *see also* 42 U.S.C. § 2000e-5. Such mitigation is commonly accomplished through obtaining replacement employment. Here, Villalpando did in fact attempt to mitigate her damages and eventually secured a higher paying job with better benefits in November of 2003. The defendant contends that because Villalpando was able to obtain a more lucrative position, she is not entitled to back pay. This court disagrees. While it is firmly established that Villalpando is not entitled to back pay for any period in which she earned an equal or higher salary then she would have earned at Aramark, *see Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999) (citing *EEOC v. N.Y. Times Broad. Serv., Inc.*, 542 F.2d 356, 359 (6th Cir. 1976)), what the defendant's argument completely overlooks is the fact that Villalpando was terminated in April of 2002—seven months before she obtained new employment. Villalpando was thus entitled to back pay for this seven month period of unemployment. Her "excess" earnings, by virtue of her ability to obtain a higher paying job some seven months subsequent to her termination from Aramark are not to be subtracted or utilized to reduce her back pay award during her period of unemployment. *See id.*; *see also Matthews v. A-1, Inc.*, 748 F.2d 975, 978-79 (5th Cir. 1984); *see also Darnell v. City of Jasper, Ala.*, 730 F.2d 653, 656-57 (11th Cir. 1984)*; Leftwich v. Harris-Stowe State Coll.*, 702 F.2d 686, 693- 94 (8th Cir. 1983). The defendant essentially asks this court to adopt an "aggregate" approach for calculating back pay damages, as opposed to a "periodic" approach. While the aggregate approach seeks equity in the long run, the approach is unpalatable in light of the need to address the particular injuries sustained by plaintiffs who are the victims of discrimination. Many courts, including the Eighth Circuit, have adopted the periodic approach to calculating a back pay award and this case does not warrant a different result. See *Darnell*, 730 F.2d at 656-57 (applying periodic basis approach to calculating back pay

awards under Title VII); *Hartman v. Duffey*, 8 F. Supp. 2d 1, 6 (D.D.C. 1998) (same); *Eichenwald v. Krigel's, Inc.*, 908 F. Supp. 1531, 1567 (D. Kan.1995) (same); *EEOC v. Fotios*, 671 F. Supp. 454, 460 (W.D. Tex. 1987) (same); *Somers v. Aldine Indep. Sch. Dist.*, 464 F. Supp. 900, 903 (S.D. Tex. 1979) (same). *See also Skalka* , 178 F.3d at 426 (applying periodic basis under the ADEA); *Leftwich* , 702 F.2d at 693 (same); *accord.* 7 *Employment Coordinator Employment Practices* § 72.41 (West 2006). For these reasons, the defendant's motion for judgment as a matter of law with respect to Villalpando's award for back pay is **denied**.

### 6. *The punitive damages*

Finally, the court comes to the primary issue of contention between the parties—the plaintiffs' respective punitive damages awards.

#### a. *Standards*

Under Title VII, punitive damages are available in employment discrimination cases such as the one filed by the plaintiffs. However, punitive damages are limited to cases in which the employer "has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad*, 527 U.S. at 530-31. In this case, the jury awarded each plaintiff $260,000.00 in punitive damages on their employment discrimination claims. The defendant argues in its motion for judgment as a matter of law that there was insufficient evidence for an award of punitive damages because no company employee serving in a managerial capacity acted with malice or reckless indifference to the plaintiffs' rights. In the alternative, Aramark asserts it made good-faith efforts to prevent discrimination in the workplace and that this provides an independent basis for vacating the punitive damages awards. The plaintiffs counter that sufficient evidence existed for the jury to conclude Tomoson was a person in a "managerial capacity," who acted with reckless indifference

and malice with respect to the plaintiffs' rights. Additionally, the plaintiffs aver the evidence introduced at trial sufficiently demonstrated that, in addition to Tomoson, management above him knew of the harassing conduct and failed to correct it.

In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999), the Supreme Court established a "two-tiered" analysis to determine when a party is entitled to punitive damages. That analysis requires a plaintiff to not only establish intentional discrimination but also "malice or reckless indifference" to the federally protected rights of the plaintiff. *Id.*; *see Webner v. Titan Distribution, Inc.*, 267 F.3d 828, 837 (8th Cir. 2001) ("Punitive damages are warranted where the plaintiff shows that the defendant engaged in a discriminatory practice 'with malice or with reckless indifference' to the plaintiff's federally protected rights.") (quoting 42 U.S.C. § 1981a(b)(1) (1994)) (citing *Kolstad*, 527 U.S. at 535; *Ogden*, 214 F.3d at 1008); *Foster*, 250 F.3d at 1196 (same) (citing *Kolstad*, 527 U.S. at 535); *Otting v. J.C. Penney Co.*, 223 F.3d 704, 711 (8th Cir. 2000) (same) (citing 42 U.S.C. § 1981a(b)(1)); *cf. Kim*, 123 F.3d at 1066 (determining that punitive damages are available in Title VII case under same standard as under 42 U.S.C. § 1981). This is so because "[s]ection 1981a(a)(1) limits compensatory and punitive awards to instances of intentional discrimination, while § 1981a(b)(1) [the provision authorizing punitive damages] requires plaintiffs to make an additional 'demonstrat[ion]' of their eligibility for punitive damages. Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *Kolstad*, 527 U.S. at 534. The United States Court of Appeals for the Eighth Circuit likewise has employed this two-tiered analysis regarding punitive damages. *See, e.g.*, *Ogden*, 214 F.3d at 1008; *Kimbrough v. Loma Linda Dev., Inc.*, 183 F.3d 782, 785 (8th Cir. 1999); *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir. 1998); *Browning*, 139 F.3d at 637;

58

*Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1248 (8th Cir. 1998); *Kim*, 123 F.3d at 1063.

The inquiry, however, does not end with a showing of requisite malice or reckless indifference on the part of one or more individuals. *Kolstad*, 527 U.S. at 539. The plaintiff must also impute liability for punitive damages to the employer. *Id.* at 539-40. In fashioning the limitations regarding the imputation of liability to employers, the *Kolstad* court relied upon general agency principles as settled within the common law. *Id.* at 541 (citing *Ellerth*, 524 U.S. at 754; *Faragher*, 524 U.S. at 804 n.4; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986)). Relying, in part, on guidance from the *Restatement (Second) of Agency* § 217C and the *Restatement (Second) of Torts* § 909, the *Kolstad* court determined that one of the situations in which punitive damages can be awarded against an employer via the acts of its agent is where "'the agent was employed in a managerial capacity and was acting in the scope of employment . . . .'" *Id.* at 542 (quoting *Restatement (Second) of Agency* § 217 C. Additionally, the *Kolstad* court noted that other situations, such as when the employer authorizes or ratifies the agent's tortious act, or if it acts recklessly in employing the harasser, may also warrant the imposition of punitive damages. *Id.* at 542-43. With respect to conduct or acts of an employee acting in a managerial capacity, the *Kolstad* court recognized that, "'[u]nfortunately, no good definition of what constitutes a 'managerial capacity' has been found.'" *Id.* at 543 (citing 2 J. Ghiardi & J. Kircher, *Punitive Damages: Law & Practice* § 24.05, at 14 (1998)). Thus, determining whether an employee was acting in a managerial capacity necessarily will involve a "fact-intensive inquiry." *Id.* (citing 2 Ghiardi, *Punitive Damages*, § 24.05; 1 L. Schlueter & K. Redden, *Punitive Damages*, § 4.4(B)(2)(a), p. 181 (3d ed. 1995)). Although the *Kolstad* court did note that such an employee must be important, the court conceded that he or she need not be the employer's "'top management, officers or

directors." *Id.* (citing 2 Ghiardi, *Punitive Damages*, § 24.05, at 14; *Restatement (Second) of Torts* § 909, at 468, cmt. b, illus. 3)).  The *Kolstad* court further recognized that the "acting within the scope of employment" requirement produced additional concerns.  *Id.* at 543.  Primarily, the Court was concerned with the Restatement's position that even if an employee engages in conduct that is expressly forbidden by the employer, if the conduct is the kind an employee is employed to perform, occurs primarily within the authorized time and space limits of employment and is motivated, at least in part, by a purpose to serve the employer, then the employee can be considered to be acting "within the scope of employment.  *Id.* at 543-44.  Thus, under the Restatement, so long as the aforementioned rules are satisfied, even an employer who made every effort to comply with the requirements of Title VII would be held liable for the discriminatory acts of agents acting in a "managerial capacity."  *Id.* at 544.  The *Kolstad* Court was dissatisfied with such a result because it would essentially reduce the incentive for employers to implement antidiscrimination programs and policies.  *Id.*  Thus, the *Kolstad* Court modified the Restatement rules, in an effort to avoid undermining the objectives underlying Title VII. *Id.* at 545.  To this end, the Court, in essence, created a "good-faith exception" to vicarious liability:

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII." [*Kolstad v. Am. Dental Ass'n*], 139 F.3d [958], 974 [(D.C. Cir. 1998)] (Tatel, J., dissenting). As the dissent [in the opinion below] recognized, "[g]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace

accomplishes" Title VII's objective of "motivat[ing] employers to detect and deter Title VII violations." )

Thus, even in situations where a managerial employee acts with malice or a reckless indifference to the rights of others, liability for punitive damages may not be imputed to an employer who makes good-faith efforts to prevent discrimination and comply with Title VII.

"It should be presumed a plaintiff has been made whole for his [or her] injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment and deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Absent a showing that a punitive damages award unreasonably "exceeds an amount that will accomplish society's goals of punishment and deterrence," or is somehow violative of due process, courts should respect the jury's imposition of damages. *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991); *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir. 1984) (noting that the "Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury").

In considering whether an employee serving in a managerial capacity acted with malice or reckless indifference, thus warranting punitive damages, the court must view the evidence in the light most favorable to the plaintiffs. *See Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir. 2002); *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 503 (8th Cir. 1998) (considering challenge to punitive damages award under abuse of discretion standard, which requires the court to view the evidence in the light most favorable to the prevailing party). "Federal law imposes a formidable burden on plaintiffs who seek

61

punitive damages" in employment discrimination cases. *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 618 (8th Cir. 2000). The question the court must answer is "whether the present record contains sufficient evidence to 'reveal whether a reasonable jury could have found' [Aramark] liable for punitive damages." *Ogden*, 214 F.3d at 1009 n.16 (quoting *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 598-99 (8th Cir. 1999)). To determine whether the plaintiffs met this burden, the court must ensure that the punitive damages standards as announced in, among other cases, *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999), *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), have been met.

### b. *Malice or reckless indifference by managerial employee*

As mentioned in the preceding discussion, Title VII allows punitive damage awards in the "narrow class of cases" where the employer acts with malice or reckless indifference to the federally protected rights of an aggrieved employee. 42 U.S.C. § 1981a(b)(1); *see also Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 495 (8th Cir. 2003). To sustain an award of punitive damages, the employee must often show something more than intentional discrimination. *Id.* at 536. "The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind," and "'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535 (discussing punitive damages under Title VII); *Rowe*, 381 F.3d at 783-84. In order to establish malice or reckless indifference, a plaintiff need not show that the defendant committed egregious or outrageous acts of misconduct. *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1048 (8th Cir. 2002) (en banc). Rather, a plaintiff need only demonstrate the defendant had the requisite state of mind, and although egregious or outrageous conduct may support

an inference of malice, the reprehensible character of the conduct is not generally considered apart from the requisite state of mind. *Kolstad*, 527 U.S. at 538. Thus, as the *Kolstad* court pointed out, an award of punitive damages is inappropriate when, for example, "the underlying theory of discrimination may be novel or poorly recognized," or when the employer (1) is unaware federal law prohibits the relevant conduct, (2) believes the discriminatory behavior is lawful, or (3) reasonably believes there is a bona fide occupational qualification defense for the discriminatory conduct. *Kolstad*, 527 U.S. at 536-37; *Webner*, 267 F.3d at 837; *see also Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, ___ F.3d ___, 2006 WL 560117, at *6 (8th Cir. 2006).

Aramark argues insufficient evidence supports the punitive damages awards because evidence of malice or reckless indifference by an employee serving in a managerial capacity is lacking. Unfortunately for the defendant, however, after meticulously reviewing the evidence in a light most favorable to the plaintiffs, this court is satisfied that the evidence presented at trial was sufficient to support the jury's punitive damages award. Both plaintiffs testified they were the victims of persistent egregious sexual harassment by Tomoson, their first-line supervisor. Not only did Tomoson comment about the plaintiffs' bodies, specifically their breasts, on a regular basis, he made crude jokes, attempted to dirty dance with them, and physically touched both plaintiffs in inappropriate areas. In addition, Tomoson preformed these acts with other employees as well. The Eighth Circuit upheld a punitive damage award based on comparable conduct in *Kimzey v. Wal-mart Stores, Inc.*, 107 F.3d 568, 575-76 (8th Cir. 1997). For example, in *Kimzey*, the evidence showed the plaintiff's store manager commented on the plaintiff's breasts and jeans, made crude jokes about her, called her names, and kicked her. *Kimzey*, 107 F.3d at 575-76. Additionally, the store manager kicked other women, commented on their bodies, called them names and used profanity. *Id.* at 576. The plaintiff's supervisor also participated

in this same type of conduct. *Id.* The parallels between the conduct at issue in *Kimzey* and the instant case need not be exhaustively compared. Suffice it to say, strikingly similar conduct was involved in both cases. The defendant does not technically dispute the reckless and malicious nature of Tomoson's conduct, however, presumably because it is beyond dispute Tomoson's conduct was sufficiently abusive under any standard. However, the defendant focuses its argument on the contention that Tomoson's conduct cannot be imputed to Aramark because he was not "serving in a managerial capacity." However, in the eyes of this court, it would be wholly inappropriate after *Kolstad* to allow the defendant to seek refuge from punitive damages simply by virtue of its extensive corporate structure. The mere fact that Aramark is a large corporation with a multi-layered management scheme is insufficient by itself to shield it from liability under Title VII. In *Kolstad*, the Supreme Court stated that whether an employee serves in a "managerial capacity" is determined by "the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." *Kolstad*, 527 U.S. at 543 (internal quotation omitted). The "employee must be important," but not necessarily "top management, officers, or directors, to be acting in a managerial capacity." *Id.* (internal quotation omitted). At the time the plaintiffs were employed, Tomoson was one of two first-line supervisors. He supervised and managed approximately 22 employees. Tomoson himself was supervised by Wisecup, the production manager. With respect to Tomoson's authority, Wisecup testified that Tomoson was in charge of a certain area of the plant. He indicated he told Tomoson that it was his responsibility for everything that went on in that area—including hiring, terminating and training the people on the work force. The defendant, however, points out that Tomoson did not actually have "absolute" discretion to run his area of the plant. For example, termination decisions had to be approved by Wisecup, and Wisecup signed off

on the disciplinary actions. Yet, under this court's reading of *Kolstad* and its progeny, this fact does not necessarily remove Tomoson from the management realm. Under *Kolstad*, a court must not only consider the *type of authority* that the employer gives to an employee, but also the *amount of discretion* that the employee had in what was done and how it was accomplished. Thus, although Tomoson may not have technically had the authority to terminate employees, the evidence at trial indicated that he had the sole discretion to make the recommendation and that his recommendation was generally "rubber-stamped" by Wisecup. Further, the authority to "'hire, fire, discipline or promote, or at least to participate in or recommend such actions,'" implies an indicium of managerial capacity. *See EEOC v. Gaddis*, 733 F.2d 1373, 1380 (10th Cir. 1984) (quoting *Miller v. Bank of Am.*, 600 F.2d 211, 213 (9th Cir. 1979)). For example, similar facts were presented and found to be sufficient to confer managerial status in post-*Kolstad* decision—*Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 444 (4th Cir. 2000). There, the plaintiff worked as a management recruiter in the management recruiting department in the human resources division. *Id.* at 437. The individual whose conduct was at issue was the manager of the management recruiting department. This individual supervised the recruiters working within the management recruiting department and answered to the head of Circuit City's human resources division. *Id.* The management recruiting department originally had nine recruiters, but was expanded to include twenty-one recruiters. The manager had the authority to hire persons to fill positions in her sole discretion and was given the discretion to organize her department as she saw fit. Based on this authority, the Fourth Circuit concluded sufficient evidence existed to support a finding that the manager served in a "managerial capacity" within the meaning of *Kolstad*. Likewise, in *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1247 (10th Cir. 1999), the Tenth Circuit applied *Kolstad* to find that both an assistant store manager, who had the

authority to suspend subordinates and make hiring and firing *recommendations*, and the store manager, whose responsibilities included the operation of the store and making hiring and firing decisions, held managerial positions for purposes of vicarious liability in the punitive damages context. Thus, even though the store manager in *EEOC v. Wal-Mart Stores, Inc.*, could only make recommendations with respect to *both* hiring and firing decisions, the Tenth Circuit had little difficulty concluding that individual was a manager within the meaning of *Kolstad*. Here, Tomoson, undisputably had equal, if not greater, authority than either of the individuals at issue in *Lowery* and *EEOC v. Wal-Mart Stores, Inc.* Accordingly, under *Kolstad* and its progeny, this court readily concludes Tomoson served in a managerial capacity.

The defendant relies heavily on *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317 (11th Cir. 1999), a case decided prior to the Supreme Court's opinion in *Kolstad*. In *Dudley*, the Eleventh Circuit held that a store co-manager and assistant manager of Wal-Mart were not high enough up Wal-Mart's corporate hierarchy to allow their actions to be a basis for imputing punitive damages to the company. *Id.* at 1323. First, however, this court notes that *Dudley* is not binding precedent on this court. Second, the viability of *Dudley* was significantly eroded and undercut by the Supreme Court's opinion in *Kolstad*. This is so because at the time *Dudley* was decided, in order for punitive damages to be assessed within the Eleventh Circuit, a plaintiff was required to show egregious conduct by the employer and to show "either that the discriminating employer was 'high[ ] up the corporate hierarchy,' or that 'higher management' countenanced or approved [the offending] behavior." *Id.* at 1323. *Kolstad*, which was pending before the Supreme Court when *Dudley* was decided, rejected the egregiousness requirement and instead, adopted the *Ellerth/Faragher* model of vicarious liability, in accord with the principles enunciated in the Restatements. Thus, *Dudley* is not persuasive authority in the eyes of this court. This

66

authority to suspend subordinates and make hiring and firing *recommendations*, and the store manager, whose responsibilities included the operation of the store and making hiring and firing decisions, held managerial positions for purposes of vicarious liability in the punitive damages context. Thus, even though the store manager in *EEOC v. Wal-Mart Stores, Inc.*, could only make recommendations with respect to *both* hiring and firing decisions, the Tenth Circuit had little difficulty concluding that individual was a manager within the meaning of *Kolstad*. Here, Tomoson, undisputably had equal, if not greater, authority than either of the individuals at issue in *Lowery* and *EEOC v. Wal-Mart Stores, Inc.* Accordingly, under *Kolstad* and its progeny, this court readily concludes Tomoson served in a managerial capacity.

The defendant relies heavily on *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317 (11th Cir. 1999), a case decided prior to the Supreme Court's opinion in *Kolstad*. In *Dudley*, the Eleventh Circuit held that a store co-manager and assistant manager of Wal-Mart were not high enough up Wal-Mart's corporate hierarchy to allow their actions to be a basis for imputing punitive damages to the company. *Id.* at 1323. First, however, this court notes that *Dudley* is not binding precedent on this court. Second, the viability of *Dudley* was significantly eroded and undercut by the Supreme Court's opinion in *Kolstad*. This is so because at the time *Dudley* was decided, in order for punitive damages to be assessed within the Eleventh Circuit, a plaintiff was required to show egregious conduct by the employer and to show "either that the discriminating employer was 'high[ ] up the corporate hierarchy,' or that 'higher management' countenanced or approved [the offending] behavior." *Id.* at 1323. *Kolstad*, which was pending before the Supreme Court when *Dudley* was decided, rejected the egregiousness requirement and instead, adopted the *Ellerth/Faragher* model of vicarious liability, in accord with the principles enunciated in the Restatements. Thus, *Dudley* is not persuasive authority in the eyes of this court. This

66

is particularly evident in light of the fact that the Eleventh Circuit expressly rejected the principles that would later be promulgated in *Kolstad*, and refused to apply the *Faragher* model of vicarious liability to punitive damages in a footnote. *See id.* at n.8. Other courts have also drawn similar conclusions and noted that *Dudley*'s precedential value was significantly eroded by *Kolstad*. *See, e.g.*, *Jeffries v. Wal-Mart Stores, Inc.*, 15 Fed. Appx. 252, 265 (6th Cir. 2001); *Cavuoti v. N.J. Transit Corp.*, 735 A.2d 548, 560 (N.J. 1999); *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456 478 (Tex. App. 2000). Thus, this court rejects the defendant's reliance on *Dudley* because the standard cited therein is neither the law of the Eighth Circuit, nor supported by the Supreme Court's decision in *Kolstad*. The defendant further relies upon *Fitzgerald v. Mountain Sates Telephone & Telegraph Co.*, 68 F.3d 1257 (10th Cir. 1995). There, the Tenth Circuit reversed an award of vicarious punitive damages because the employee whose conduct was at issue "did not have the typical discretion of a manager, such as the power to make independent decisions regarding personnel matters or determine policy." *Id.* at 1264. Completely glossing over the fact that Tomoson was undisputably vested with the authority to make a number of independent personnel decisions, the defendant capitalizes on the fact that Tomoson had no authority to set policy for Aramark. This same argument was advanced and rejected by the Tenth Circuit in *EEOC v. Wal-Mart Stores, Inc.* There, in a footnote, the Tenth Circuit disposed of such an argument as follows:

> Wal-Mart relies heavily on our statement in *Fitzgerald* that in assessing agency for punitive damages purposes, we look at whether a managerial employee has "some power to set policy for the company." 68 F.3d at 1263 (citing *Mattingly, Inc. v. Beatrice Foods Co.*, 835 F.2d 1547, 1565 (10th Cir. 1987)). Wal-Mart's focus on the words "power to set policy" overlooks the context of that statement;

in the same sentence, we stated that "we look at the stature and authority of the agent to exercise control, discretion and independent judgment over a certain area of a business." *Id*. This language in *Fitzgerald* by no means implies the proposition, squarely contrary to our established precedent, that only an executive with power to set policy for all of Wal-Mart's many stores can be an agent of the company. *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1175 n.17 (10th Cir. 1981) (*en banc*).

*EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d at 1247 n.4. Thus, pursuant to the Tenth Circuit's clarification in *EEOC v. Wal-Mart Stores, Inc.*, *Fitzgerald* actually undermines the defendant's denial of Tomoson's managerial status. *Fitzgerald* did not hold, as the defendant appears to argue, that to be a manager an individual must have the authority to set policy for the entire corporation; rather, the authority to set policy within a certain area was enough. Thus, Wisecup's delegation to Tomoson of the power to exercise control and judgment and to set the policy within his area of the production department demonstrates his managerial stature. *See id*. Consequently, the defendant's reliance on *Fitzgerald* is unavailing.

Furthermore, assuming *arguendo*, Tomoson did not serve in a "managerial capacity" and his conduct could not, therefore, be imputed to Aramark, ample evidence existed in the record that the management above Tomoson knew of his abusive conduct and failed to take effective action to stop such conduct. The jury was entitled to conclude that based on the pervasiveness and overtness of Tomoson's conduct, that Wisecup knew of his actions. The sexually explicit conduct and comments occurred in plain sight during regular business hours with great frequency. Lopez testified the conduct complained of would have been observable to Wisecup, and that Wisecup witnessed and was made aware of

some of the incidents that occurred between the plaintiffs and their coworkers. Based on the totality of the evidence in this case, a reasonable inference is that Wisecup was aware of the degradation of Aramark's female employees in general, and specifically, of Lopez and Villalpando. *See Baker v. John Morrell & Co.*, 266 F. Supp. 2d 909, 953 (N.D. Iowa 2003) (pointing out offending conduct occurred in plain sight and within earshot of supervising employees and concluding that based on the totality of the evidence, there was no doubt the employer knew of the hostility occurring at its facility). Further, it is undisputed Lopez complained following her termination, and Aramark refused to take action or reprimand Tomoson absent corroboration of her complaints. *See Henderson*, 217 F.3d at 614-15 (finding punitive damages warranted, based in part on the defendant employer's refusal to act absent corroboration of the plaintiff's complaints). Morever, the investigation was not further pursued once Lopez concluded she did not want to return to work for Aramark, and Tomoson was never reprimanded, disciplined or further investigated. In addition, Villalpando testified she complained to Wisecup on numerous occasions, but to no avail. Further, she indicated she utilized the 1-800 hotline to report Tomoson's conduct, but no action was taken. Herzberger indicated no investigation was ever conducted into Villalpando's allegations because at the time she filed her complaint with the ICRC, Villalpando was no longer employed at Aramark. This clearly evinces a lack of care and utter disregard for the actions of Tomoson. This situation is similar to *Rowe v. Hussman*, where the plaintiff was subjected to a barrage of offensive comments, forced touching and threats by a coworker. *Rowe*, 381 F.3d at 784. There, the Eighth Circuit concluded that the jury was entitled to find the department manager knew of the abusive and degrading environment and allowed it to persist. *Id.* Based on this conclusion, the court found the evidence sufficient to support an award of punitive damages. *Id.* Specifically, the court stated:

Recklessness and outrageousness may be inferred from evidence of "management's participation in the discriminatory conduct," *Kimzey*, 107 F.3d at 575, or where an employee's repeated complaints to supervisors fall on deaf ears. *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 619 (8th Cir. 2000). In light of [the department manager's] knowledge of [the coworker's] abusive conduct, his repeated failure to take effective action to put a stop to such conduct, and his defense of and excuses for that conduct, all chargeable to [the employer], the evidence is sufficient to support the award of punitive damages.

*Id.* Likewise, in *Kimbrough v. Loma Linda Development, Inc.*, 183 F.3d 782 (8th Cir. 1999) the Eighth Circuit upheld an award of punitive damages where there was evidence that the general manager ratified a first-line supervisor's abusive conduct and repeatedly ignored complaints of harassment. *Id.* at 785. Consequently, in light of Wisecup's knowledge of Tomoson's conduct and his repeated failure to remedy the situation or address the complaints he received, and his subsequent ratification of Tomoson's recommendation to terminate Lopez without ever questioning Tomoson's motives or judgment despite the complaints he had received about Tomoson, the evidence is sufficient, in accord with the holdings in *Rowe* and *Kimbrough*, to support the awards of punitive damages to the plaintiffs. *See id.*; *see also Rowe*, 381 F.3d at 784; *accord Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001) (holding the jury could have credited the plaintiff's testimony that despite her complaints to company officials, the company did nothing to remedy the persistent sexual harassment). Thus, the punitive damages verdicts can stand on either of two forms of imputed liability: First, that the agent was employed in a "managerial capacity" or the "principal or a managerial agent of the principal ratified or approved the act." *Restatement (Second) of Agency*, §§ 217C(c), (d).

In support of its contention that the plaintiffs have not met their "formidable

burden" of showing entitlement to punitive damages, Aramark cites *Webner v. Titan Distribution, Inc.*, 267 F.3d 828 (8th Cir. 2001), and *Browning v. President Riverboat Casino-Missouri*, Inc., 139 F.3d 631 (8th Cir. 1998). Comparison to these cases, however, is unavailing. In *Webner*, the Court of Appeals for the Eighth Circuit held that application of punitive damages was inappropriate, even though the plaintiff proved disability discrimination, because the employer's "actions were consistent with an employer acting to protect itself against the possible sporadic absence of an employee." *Webner*, 267 F.3d at 837. The Eighth Circuit's decision in *Webner* was based on the Supreme Court's holding in *Kolstad* that delineated specific situations in which punitive damages were inappropriate despite an employer's intentional discrimination. *See id.* As noted elsewhere in this opinion, the Court determined that, to warrant punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536. Nevertheless, the Court held that, even in the face of such a risk, there are four instances in which intentional discrimination will not give rise to punitive damages liability. *Id.* at 537. One such instance was present in *Webner*: "an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability." *Id.*; *see Webner*, 267 F.3d at 837 (citing *Kolstad*, 527 U.S. at 536-37). In accord with this language in *Kolstad*, the Court of Appeals in *Webner* determined that Titan's stated reasons for discriminating against the plaintiff—"that his back injury precluded him from performing all but light duty tasks, Titan was fearful that Webner would reinjure his back, and Titan did not have a job suited to his disability"—fell into the category of unlawful employment discrimination cases that the *Kolstad* Court held did not demonstrate "malicious or reckless indifference" conduct within the meaning of 42 U.S.C. § 1981a due to the fact the employer honestly believed it legally terminated the plaintiff. *See Webner*, 267 F.3d at 837. Here, Aramark

attempts to fit its case, at least with respect to Lopez, within the holding of *Webner* by asserting the company terminated her for excessive absenteeism. However, *Webner* is inapposite to Lopez's case. First, *Webner* dealt with a claim of discrimination under the ADA. The evidence indicated the employer reasonably believed its termination of the plaintiff was lawful because the employer thought they did not have a job suited to the plaintiff's disability—which, if it had been true, would not have been violative of the ADA. In contrast, here, sufficient evidence in the record existed to support the conclusion that Aramark's nondiscriminatory reason for Lopez's termination—her excessive absences— was pretextual and that, consequently, Aramark did not reasonably believe its actions were legal. Second, in *Webner*, the only act of discrimination was the employer's termination of the employee, whereas here, myriad other instances of discrimination occurred and went unremedied. Thus, Lopez's case is clearly distinguishable from *Webner*.

The Eighth Circuit also held that punitive damages liability was not appropriate in *Browning*. *Browning*, 139 F.3d at 636-37. In *Browning*, the race discrimination plaintiff prevailed at trial against his employer, a riverboat casino, proving that the riverboat terminated his employment as a security manager because of his race. *Id.* at 633. To support his punitive damages claim on appeal, the plaintiff pointed only to the riverboat's intentional discrimination and an alleged failure by a high-ranking executive to meaningfully investigate Browning's discrimination charge. *Id.* at 637. The Court of Appeals for the Eighth Circuit held that this evidence did not support a finding that the riverboat acted with either malice or reckless indifference. *Id.* In *Browning*, the plaintiff was hired to work for the riverboat as a security manager. The plaintiff was white and the other two security managers and the plaintiff's immediate supervisor were black. The plaintiff alleged he was discharged from employment because of his race. In support of his claim, the plaintiff relied on the following allegations: (1) he was assigned to the

undesirable, graveyard shift, (2) he was criticized for keeping a messy desk when others with messier desks were not admonished; (3) his supervisor instructed the typist not to do any work for the plaintiff but allowed her to do work for the other two security managers; and (4) after having a meeting with the plaintiff, his supervisor stated that "'that white boy better learn who he's messing with, he better get his act together.'" *Id* at 633-34. Obviously, the conduct at issue in *Browning* was both less severe and pervasive than the conduct at issue in this case. Furthermore, in stark contrast to the *Browning* case, where the plaintiff never voiced objections to any of the incidents, the plaintiffs here repeatedly launched objections to Tomoson with respect to his degrading conduct, yet he continued his barrage of harassment in spite of the plaintiffs' objections. In addition, based on the evidence presented at trial, the jury could have concluded Wisecup knew of Tomoson's conduct prior to the plaintiffs' respective terminations and found that Aramark failed to meaningfully investigate Tomoson's conduct and to take appropriate remedial action calculated to end the harassment. In contrast, Browning alleged a single failure to meaningfully investigate his complaints. *Id*. Moreover, the harassment at Aramark occurred on a regular basis for months—virtually throughout the entire course of the plaintiffs' employment—whereas in *Browning*, the plaintiff was employed for a mere sixty-seven day period. Thus, *Browning* is clearly distinguishable from the case at bar. Viewing the evidence in the light most favorable to the plaintiffs, the jury could reasonably have concluded that both Tomoson's and Aramark's response to the plaintiffs' unremedied complaints constituted a pattern of deliberate indifference that, unlike in *Browning*, rose to the level to support punitive damages liability because of the frequency of the plaintiffs' objections to the conduct made to both Tomoson and Wisecup and the duration and frequency of the harassment, which instead of being remedied, continued to escalate. Furthermore, *Browning* was a pre-*Kolstad*, decision and was not analyzed under the

73

Supreme Court's analytical framework set forth therein. For these reasons, this court is not persuaded by *Browning*.

Consequently, although during the trial of this matter, this court originally expressed reservations with respect to the submission of the punitive damages issue to the jury, after an extensive and thorough review of the entire trial transcript it is clear that sufficient evidence existed to support both the submission of the issue and the subsequent punitive damages awards to both plaintiffs. Accordingly, this court finds the defendant is not entitled to judgment as a matter of law on these grounds. Although this court, had it been the trier of fact, may have been inclined to arrive at a contrary conclusion as did the jury in this case, the determination in this case was within the rightful province of the jury and because sufficient evidence supports the jury's conclusion, the punitive damages awards to both plaintiffs must stand.

### c. *Aramark's good-faith defense*

As noted above, an employer may escape vicarious liability for the discriminatory employment decisions of managerial employees where those decisions are contrary to the employer's "good faith efforts to comply with Title VII." *Ogden*, 214 F.3d at 1009 (citing *Kolstad*, 527 U.S. at 545). The Supreme Court in *Kolstad* did not define the contours of what measures constitute "good faith efforts," recognizing only that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms" and "the purposes underlying Title VII are similarly advanced where employers are encouraged to adopt anti-discrimination policies and to educate their personnel on Title VII's prohibitions." *Kolstad*, 527 U.S. at 545; *see Ogden*, 214 F.3d at 1009.

"Employers have an 'affirmative obligation' to prevent civil rights violations in the workplace." *Madison v. IBP, Inc.*, 257 F.3d 780, 795 (8th Cir. 2001) (citing *Faragher*, 524 U.S. at 806). An existence of a written anti-discrimination policy, standing alone,

does not insulate an employer from vicarious liability by establishing it made good faith efforts to comply with Title VII. *E.g., Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001) ("Every court to have addressed this issue thus far has concluded that, although the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award."); *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000) ("[A] written non-discrimination policy is one indication of an employer's efforts to comply with Title VII. But a written statement, without more, is insufficient to insulate an employer from punitive damages liability.") (citations omitted); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000) ("[E]ven if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware."); *Ogden*, 214 F.3d at 1010 (rejecting appellant's contention that written sexual harassment policy established its good faith efforts and stating, "'[p]lainly, such evidence does not suffice, as a matter of law,' to establish 'good faith efforts'") (quoting *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 517 (9th Cir. 2000) ( "[A]n employer must show not only that it has adopted an antidiscrimination policy, but that it has implemented that policy in good faith."). "A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate." *Romano*, 233 F.3d at 670. "Although the purpose of Title VII is served by rewarding employers who adopt anti-discrimination policies, it would be undermined if those policies were not

implemented, and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of their managerial employees." *Passantino*, 212 F.3d at 517.

Although Aramark did have a formal non-discrimination policy in place, the extent to which such policy was enforced is highly suspect. Tomoson testified he had never received any training about sexual harassment and did not know if there was a policy. Likewise, Wisecup indicated he received virtually no training and did not know who was responsible for such training at Aramark, but thought that it "probably" was someone in human resources. Aramark attempts to rely on the 1-800 video that was shown and the 1-800 hotline card that was provided to the employees. However, the testimony elicited at trial indicated the training was not taken seriously, that the video could not be heard, and was not available in Spanish, despite the high number of Hispanic-speaking employees. Aramark also points out that its handbook for nonunion employees contained an antidiscrimination policy, but it is clear this handbook was only for "nonunion" employees, and that it was simply distributed to new employees without discussion, comment or guidance. In addition, neither plaintiff recalled seeing the EEO posters and policies Aramark contended it posted in its Sioux City facility, implying that Aramark did not highlight or mention the existence of these posters and policies to its new employees.

Furthermore, even if such practices could be considered "good-faith efforts," it is clear that sufficient evidence was presented at trial indicating this policy was effectively disregarded by Aramark. Wisecup knew of the harassment and failed to admonish or reprimand Tomoson. Villalpando called the 1-800 hotline, but no action was taken. Even more disturbing is the number of coworkers who were aware Villalpando called the hotline when she returned to work despite Aramark's representation that the hotline was designed to be confidential in nature. Lopez filed a complaint with the union following her

termination, which was not given credence simply due to the lack of corroborating evidence by a handful of witnesses. Based on the fact that many, if not all of the witnesses were illegally working in this country and desperately needed their jobs, the lack of corroboration should have hardly been dispositive of Aramark's investigation. Even more distasteful was Aramark's decision to suspend the investigation upon receiving notice that Lopez did not want her job back and that Tomoson received no adverse repercussions and his conduct was not further observed or inquired into. If the jury accepted this evidence, which its verdict in the plaintiffs' favor suggests it did, then it could have concluded that Aramark did not make a good faith effort to comply with Title VII despite its formal anti-discrimination policy. *See Baker*, 266 F. Supp. 2d at 960 (citing *Lowery*, 206 F.3d at 446). For these reasons and for the reasons articulated in the court's "malice or reckless indifference" discussion, the court finds that the evidence supports the jury's reasonable conclusion that Aramark should not be exempted from vicarious liability for the malice and reckless indifference on the part of its managerial agents to the plaintiffs' rights to be protected from sexual harassment.

It behooves the court to note that a contrary conclusion would essentially usurp the plaintiffs' rights to a trial by jury, a right that has been regarded as both fundamental and sacred, and deserving of jealous guardianship. *Jacob v. City of New York*, 315 U.S. 752, 752-53 (1942) ("A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."). This import and magnitude of this right has long been recognized.[12] Blackstone characterized

---

[12] Interestingly, prominent among the reasons for the Texas Revolution that took place at the Alamo in San Antonio, Texas, was the complaint that the Mexican government "'ha[d] failed and refused to secure, on a firm basis, the right to trial by jury, that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the

(continued...)

it as "the glory of the English law" and "the most transcendent privilege which any subject can enjoy." *Dimick v. Schiedt*, 293 U.S. 474, 485 (1935) (quotations and citation omitted). The First Congress's passage of the Seventh Amendment in 1789 and the 102nd Congress's passage of 42 U.S.C. § 1981a in 1991 reflect two centuries of deep and abiding faith in trial by jury. More than that, constitutional and statutory mandates for trial by jury reflect an immutable preference that certain matters be left to the collective judgment of a jury of peers, rather than reposed in a single, albeit industrious and well-meaning, district court judge. Thus, although a different trier of fact may not have arrived at the same conclusion as did the jury in this case, the burden of resolving factual disputes is a task properly shouldered by the jury. As the United States Supreme Court stated in *Dimick v. Schiedt*, 293 U.S. 474, 485-86 (1935):

> With, perhaps, some exceptions, trial by jury has always been, and still is, generally regarded as the normal and preferable mode of disposing of issues of fact in civil cases at law as well as in criminal cases. Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

*Id.* (citation omitted). Accordingly, because sufficient evidence existed for the jury to reasonably conclude punitive damages were warranted, this determination must be preserved and the defendant's motion for judgment as a matter of law is **denied in its entirety**.

---

[12](...continued)
citizen.'" *See* James L. "Larry" Wright & M. Matthew Williams, *Remember the Alamo: The Seventh Amendment of the United States Constitution, the Doctrine of Incorporation, and State Caps on Jury Awards*, 45 *S. Tex. L. Rev.* 449, 451-53 (2004) (quoting the Texas Declaration of Independence para. 10 (1836)).

## C.  The Amount Of The Punitive Damages Award

### 1.    Excessive verdict

Arguments that punitive damages awards are excessive fall into two categories: (1) challenges based on the sufficiency of the evidence supporting the amount of the award, and (2) constitutional challenges to the award under the Due Process Clause, which "prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm*, 538 U.S. at 416.  Before analyzing the issues at hand, the court would like to take a moment to clarify the differences between two of the remedies requested by the defendant:  a reduction in the punitive damages awards to comport with due process and a remittitur. As the Eleventh Circuit Court of Appeals has aptly explained:

> A constitutionally reduced verdict . . . is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts.  A constitutional reduction, on the other hand, is a determination that the law does not permit the award.  Unlike a remittitur, which is discretionary with the court . . . a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331-32 (11th Cir. 1999) (emphasis in original).

A district court has a mandatory duty to correct unconstitutionally excessive verdicts to conform with the requirements of the due process clause.  *Ross*, 293 F.3d at 1048 (citing *Gore*, 517 U.S. at 572- 74).  Reasonableness of a punitive damages award requires evaluation of the factors enumerated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996):  the degree of reprehensibility of the defendant's conduct; the ratio or relationship between actual harm inflicted on the plaintiff and the punitive damages award;

and civil penalties authorized for comparable misconduct. *Id.* at 575. Also instructive is the Supreme Court's revisit of *Gore* in the recent case of *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003).[13] As the court has the power, without the permission of the parties, to enter judgment for an amount consistent with the constitutional limit on an award of punitive damages—it follows that the court, in reducing a constitutionally excessive award, "proceeds under Rule 50, not Rule 59, in the entry of judgment for a constitutionally reduced award." *Johansen*, 170 F.3d at 1331. The court need not obtain the consent of the plaintiff in order to reduce the award—the court's duty in this respect is independent of the Seventh Amendment constraints on the plaintiff's right to consent to a remittitur. *Ross*, 293 F.3d at 1049-50. Technically, a reduction of an excessive punitive damages award that violates due process is not a remittitur. *See id.* at 1049 ("[W]hile perhaps labeled as such, the action the district court took was not actually a remittitur, but instead was simply a reduction of the excessive punitive damages award in conformity with constitutional limits."); *Callantine v. Staff Builders, Inc.*, 271 F.3d 1124, 1134 (8th Cir. 2001) (scrutinizing a punitive damages award under the *Gore* factors, and reducing such award for unconstitutional excessiveness, though labeling the reduction a remittitur).

In contrast, a remittitur is ordered "only when the verdict is so grossly excessive as to shock the conscience of the court." *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir. 1983); *see also Foster*, 250 F.3d at 1194 (stating that a new trial or remittitur is appropriate if the damages are so grossly excessive as to shock the conscience of the court). "A verdict is not considered excessive unless there is 'plain injustice' or a 'monstrous' or 'shocking' result." *Eich v. Bd. of Regents for Cent. Miss. State Univ.*, 350

---

[13]The analysis mandated by these two Supreme Court cases will be discussed in further detail below.

F.3d 752, 763 (8th Cir. 2003) (quoting *Jenkins*, 859 F.2d at 600); *see also Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1211 (8th Cir. 1999); *Stafford v. Neurological Medicine, Inc.*, 811 F.2d 470, 475 (8th Cir. 1987). Generally, "where a punitive damage award is the result of passion and prejudice, a new trial is required and [ ] a remittitur is not an appropriate remedy." *Parsons v. First Investors Corp.*, 122 F.3d 525, 529 (8th Cir. 1997) (citation and quotations omitted). "The decision to order a remittitur is circumscribed by the Seventh Amendment." *Thorne*, 197 F.3d at 1213. Ordinarily, where the court determines a remittitur to be appropriate, the plaintiff must be allowed to elect between the judgment as remitted and a new trial. *Id.*

The Eighth Circuit Court of Appeals has recently discussed when it is appropriate for a district court to order a remittitur:

> In this circuit, a district court should order remittitur "only when the verdict is so grossly excessive as to shock the conscience of the court." *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir.1983). A verdict is not considered excessive unless there is "plain injustice" or a "monstrous" or "shocking" result. *Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir. 1988).

*Eich*, 350 F.3d at 763. Whether a verdict is sufficiently outrageous to warrant remittitur is committed to the discretion of the district court. *Benny M. Estes and Assocs., Inc. v. Time Ins. Co.*, 980 F.2d 1228, 1235 (8th Cir. 1992); *Hollins v. Powell*, 773 F.2d 191, 197 (8th Cir. 1985). The grant or denial of a remittitur by the district court is reviewed for abuse of discretion. *Estes*, 980 F.2d at 1235. Here, Aramark has asserted both that the punitive damages awarded to the plaintiffs are (1) constitutionally excessive and (2) unreasonable under the facts of the case. Because Aramark challenges the reasonableness of the punitive damages awards under the facts of this case and because the court has an independent duty to ensure that the awards do not violate the Due Process Clause of the

Fourteenth Amendment to the United States Constitution, the court will address both issues in turn. First, however, a brief discussion of the statutory damages cap provision that is applicable to Title VII cases is warranted.

### 2. *Statutory damages cap provision*

Section 1981a(b)(3)(D) of Chapter 42 of the United States Code provides that "the sum of the amount of compensatory damages awarded under [Title VII] for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed... $300,000." Back pay is specifically excluded from the realm of the cap. 42 U.S.C. § 1981a(b)(2). Thus, in this case, because the plaintiffs were awarded $35,000 in emotional distress damages, the maximum amount of punitive damages they could have received under Title VII was $265,000. The jury's award of $260,000 to each plaintiff was therefore within Title VII's statutory limitation on damages. Thus, because no reduction of the punitive damages is warranted under 42 U.S.C. § 1981a, the court will now consider the excessiveness of the punitive damages award.

### 3. *Constitutionality*

#### a. *Standards*

"The general rule is that the amount of punitive damages must bear some reasonable relation to the injury inflicted and its cause." *In re Atlas Mach. & Iron Works, Inc.*, 190 B.R. 796, 805 (Bankr. E.D. Va. 1995); *see also Gore*, 517 U.S. at 580 (explaining that the proper inquiry is whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred); *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (punitive damages must be "'reasonable in their amount and rational in light of their

purpose to punish what has occurred and to deter its repetition.'") (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991)).  In this case, the jury was specifically instructed to use reason in setting the amount of punitive damages and that any award of punitive damages should bear a reasonable relationship to the harm caused to the plaintiffs by the defendant's misconduct.[14]

In *Gore*, the Court held that the Constitution provides an upper limit on punitive damage awards so that a wrongdoer has "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that . . . may [be] impose[d]." *Id.* at 574.  To determine whether a jury award of punitive damages violates a defendant's due process rights,[15] *Gore* instructs courts to consider three guideposts,

---

[14]Final Jury Instruction No. 8, "Punitive Damages," provides:
> If you decide to award punitive damages on a particular claim, you should consider the following factors in determining the amount of the punitive damages to award:  the nature of the defendant's conduct under the totality of the circumstances; the frequency of the defendant's conduct; how reprehensible the defendant's conduct was toward the plaintiff, what amount of punitive damages, in addition to any damages for emotional distress and backpay already awarded, is needed, considering the defendant's financial condition, to punish the defendant for its wrongful conduct toward the plaintiff that is at issue in that particular claim and to deter the defendant and others from similar wrongful conduct in the future; the amount of fines and civil penalties, if any, applicable to similar conduct; and whether the amount of punitive damages bears a reasonable relationship to the compensatory damages awarded.

[15]Although *Gore* involved a Fourteenth Amendment due process review of a state's imposition of punitive damages on a tortfeasor, the Court of Appeals for the Eighth Circuit has applied the *Gore* analysis to review a federally imposed punitive damages award in an employment discrimination case.  *See Henderson*, 217 F.3d at 619.

including (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the plaintiff's compensatory damages and punitive damages award, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Id*. at 574-75. Among other functions, the guideposts "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426. While all three guideposts have a bearing on the outcome of a court's decision, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. The Supreme Court recently reiterated the importance of this guidepost in *State Farm*, 538 U.S. at 419. Still, "the reprehensibility analysis of the punitive damages in a case does not provide a 'platform to expose, and punish, the perceived deficiencies of the defendant's conduct throughout the country rather than that directed at the plaintiff." *Id*. at 1516. With this in mind the court will now undertake this analysis of the case at bar.

### b.    *Analysis under the* Gore *guideposts*

*i.    Reprehensibility*.    As mentioned previously, "the most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Reprehensibility of a defendant is determined by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery or deceit or mere accident.

*State Farm*, 538 U.S. at 419. The defendant argues that its conduct does not fit any of the

'aggravating factors' the Supreme Court has instructed courts to consider in determining the reprehensibility of a defendant's conduct. Specifically, the defendant contends that: (1) there was no evidence of economic or physical harm to the plaintiffs that was proximately caused by the defendant's conduct; (2) the defendant's conduct could not be classified as indifferent, or in reckless disregard, for the health or safety of others as the defendant conducted a satisfactory investigation following Lopez's formal complaint after her termination; and (3) the plaintiffs did not introduce any evidence of repeated misconduct by the defendant. The plaintiffs assert that they were mercilessly and repeatedly harassed by Tomoson, with the knowledge of upper management, and that Aramark utterly failed to protect them and their rights. In analyzing the reprehensibility of Aramark's misconduct, the court must view the evidence in the light most favorable to the plaintiffs. *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1230-31 (10th Cir.), *cert. granted in part*, 531 U.S. 978 (2000), *aff'd* 532 U.S. 588 (2001); *see also Baker*, 266 F. Supp. 2d at 962.

Here, Tomoson's unlawful conduct in this case, which is imputed to Aramark due to his managerial capacity and supervisory stature, cannot be characterized as anything but reprehensible. Tomoson physically touched the female workers at Aramark, picked them up and shook them to watch their breasts move, leered at their breasts, commented about their breasts, told lewd jokes, and dirty danced in a simulated sexual manner behind female workers. In addition, Tomoson treated the women who went along with his conduct with favoritism, allowing them to take longer breaks and assigning them to easier job duties. In addition, Tomoson's conduct created workplace friction, which ultimately escalated into physical harm to Villalpando on two occasions, one time requiring a trip to the hospital. Tomoson's conduct was repetitive, consistent and routine throughout the entire time the plaintiffs were employed at Aramark. Ultimately, the plaintiffs' objections to Tomoson's

conduct resulted in retaliation and caused economic harm to the plaintiffs. The harm was heightened by the fact that many, if not all, of the workers at Aramark, including Lopez and Villalpando, were financially vulnerable because they were poor and uneducated. At a minimum, Tomoson's behavior amounted to a reckless indifference to the plaintiffs' federally protected rights. *See Kim*, 123 F.3d at 1067-68.

However, aside from the purely condemnable nature of Tomoson's conduct, the court finds a number of additional factors increase the reprehensibility level of the defendant's conduct. For instance, upper management at Aramark, specifically Wisecup, failed to address the plaintiffs' complaints or admonish Tomoson regarding his overt behavior, the 1-800 hotline, which was represented to employees to be a confidential medium to report workplace misconduct was anything but, and management, in addition to employees at Aramark, received minimal, if any, training with respect to sexual harassment. Furthermore, even after Lopez filed a formal complaint, after interviewing a few witnesses, Tomoson and Lopez, due to the lack of corroboration of Lopez's complaint, the investigation was dropped and Tomoson was never reprimanded in any way by the company. Further, after the company received notice of Villalpando's claim, no investigation was conducted because "she no longer worked there."[16] Additionally, no

_____

[16]The defendant, in its brief, asserts Herzberger testified an investigation was never conducted because the Company never received a complaint about harassment. However, the page citation given by the defendant to the trial transcript with respect to Herzberger's testimony reveals otherwise:

Q.    Did you conduct a similar investigation when
       Maricela Villalpando made her claim?
A.    I did not, no.
Q.    And why not?
A.    She was no longer employed at Aramark.

(continued...)

evidence was presented by the defendant that it implemented additional sexual harassment training or policies following this incident. *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) (considering "possible harm to other victims" where no corrective action was taken, in assessing reasonableness of the punitive damages award); *Bains L.L.C. v. Arco Prods. Co.*, 220 F. Supp. 2d 1193, 1200 (W.D. Wash. 2002) (finding reprehensibility demonstrated by defendant's failure to investigate racial harassment complaint or improve the conditions at the facility). Aramark attempts to soften the reprehensible nature of its conduct by contending Tomoson had never before been the subject of a sexual harassment complaint. However, in light of the fact most of Aramark's employees were illegal immigrants who could not speak English, or spoke it only as a second-language, and received little to no training regarding EEO in English, and no training translated in Spanish, this fact quickly loses its force. All of these factors serve to further increase the reprehensibility of the defendant's conduct because a reasonable inference is that both upper and lower management at Aramark preyed upon the less fortunate.

*ii.* **Proportionality**. "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff[s]." *Gore*, 517 U.S. at 580. Predictably, with regard to this factor, the defendant contends the punitive to compensatory ratio per plaintiff—7:1 for Lopez and 6:1 for Villalpando—is substantial. The defendant also states that its conduct, even if viewed in the light most favorable to the plaintiffs, is not particularly egregious.

---

[16](...continued)

*See* Trial Tr. 852:18-25.

The defendant further elaborates on how its knowledge of the nature of the incidents was hotly contested at trial, and how by the time the defendant was made aware of the nature of the offending employee's conduct, Lopez had already been terminated. The plaintiffs' argument focuses on the assertion that other cases have sustained much higher ratios and that because the plaintiffs' total award is within Title VII's statutory cap on damages it is, therefore, presumptively reasonable.

Despite requiring the disparity between the punitive and actual monetary awards to be reasonable, the Supreme Court has declined to impose a "bright-line ratio which a punitive damages award cannot exceed," and continues to rebuke the imposition of any rigid mathematical formula in determining the reasonableness of a punitive to compensatory damages ratio. *State Farm*, 538 U.S. at 425; *Gore*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula."); *see United States v. Big D Enters., Inc.*, 184 F.3d 924 (8th Cir. 1999) ("Consistent with the Supreme Court, we eschew facile reliance on mathematical formulas for determining the appropriateness of punitive damages awards."). In spite of its reluctance to draw a line in the sand that punitive damages awards may not cross, the Court has stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. Here, however, the plaintiffs' awards were within a single-digit ratio, a far cry from proportions that raise any judicial eyebrows. *See id.* Further, given the low actual damages due to the plaintiffs' short period of employment and the difficulty in measuring actual damages in a case involving "primarily personal" injury, this court holds that this is a constitutionally acceptable ratio between punitive and compensatory damages. *Deters v. Equifax Credit Information. Servs.*, 202 F.3d 1262, 1273 (10th Cir. 2000).

*iii.* *Comparable civil or criminal penalties*. The third indicium of excessiveness is exposed through a comparison between the punitive damages award and "the civil or criminal penalties that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583. However, there are no civil or criminal penalties imposed for the type of misconduct at issue in this case. While both the defendant and the plaintiff provide the court with myriad examples of other decided cases, some allowing higher awards, some providing for lesser awards, in this court's view, the parties have misconstrued the purpose of this guidepost. Decided cases are relevant, indeed, but positive law—that is, statutes and regulations—are even more critical. Moreover, what is essentially at issue and should be in the foreground in a court's search for comparisons is whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall by comparing factually similar cases. In *Gore,* for example, which involved a type of fraudulent business practice, the Supreme Court found that the maximum fine that could be imposed for the fraudulent conduct was $10,000.00, while the punitive damages awards in those cases were $2 million. *Gore*, 517 U.S. at 583. Since none of the applicable statutes provided the defendant with "fair notice that the first violation . . . of the [state statute's] provisions might subject an offender to a multimillion dollar penalty," the punitive damages award failed to pass muster in the eyes of the Court. *Id.* Here, however, the defendant had sufficient notice. This is due to the statutory damages cap promulgated by Congress in 42 U.S.C. § 1981a(b)(3)(A), which specifically provides employers with notice of the amount of damages that may be assessed against an employer who intentionally violates Title VII. The damages awarded by the jury are within the statutory cap limitations. Therefore, the defendant "had ample notice it was subject to punitive damages for conduct that was . . . in gross disregard of plaintiffs['] rights." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1116 (10th

Cir. 2001); *see also Romano*, 233 F.3d at 674 ("[A] defendant, through the statutory scheme of Title VII and the punitive damages cap figures set out therein, has full notice of the potential liability to which it was subject.") (citing *Deters*, 202 F.3d at 1272).

    ***iv.***   ***Resolution***. In light of the foregoing analysis of the punitive damages award under the *Gore* guideposts, on balance, the court has concluded that the punitive damages award of $260,000.00 per plaintiff is reasonable and does not violate the defendant's due process rights. Consequently, the defendant's due process claim as to the amount of punitive damages awarded to the plaintiffs is rejected.

    ***4.***   ***Remittitur***

    The defendant has alternatively requested remittitur of all amounts awarded by the jury, including punitive damages. The defendant relies on all of the arguments previously discussed herein as support for this request. The proper role of the federal courts in reviewing the size of a jury verdict in determining whether a remittitur is warranted is a matter of federal law. *Schaefer v. Spider Staging Corp.*, 275 F.3d 735, 738 (8th Cir. 2002) (citing *Parsons*, 122 F.3d at 528); *see also In re Knickerbocker*, 827 F.2d 281, 289 n.6 (8th Cir. 1987); *Am. Bus. Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1146 (8th Cir. 1986). "In this circuit, a district court should order remittitur 'only when the verdict is so grossly excessive as to shock the conscience of the court.'" *Eich*, 350 F.3d at 764 (quoting *Ouachita Nat'l Bank*, 716 F.2d at 488); *see also Am. Bus. Interiors, Inc.*, 798 F.2d at 1146; *see also Triton Corp. v. Hardrives, Inc.*, 85 F.3d 343, 347 (8th Cir. 1996) (district court should grant remittitur only when the award is so excessive as to shock the court's conscience); *Norton v. Caremark, Inc.*, 20 F.3d 330, 340 (8th Cir. 1994) (citing *Am. Bus. Interiors, Inc.*, 798 F.2d at 1146). A verdict qualifies as "grossly excessive" where it is plainly unjust or constitutes a "monstrous" or "shocking" result. *See id.* (quoting *Jenkins*, 859 F.2d at 600). Recognizing that the trial court has heard the evidence

and is familiar with the community's standards, the Eighth Circuit has indicated that it will "review a denial of a remittitur for a 'manifest abuse of discretion,' and will reverse 'only when in rare circumstances [it is] pressed to conclude that the verdict represents a monstrous or shocking injustice.'" *Norton*, 20 F.3d at 340 (citing *Am. Bus. Interiors, Inc.*, 798 F.2d at 1146).

As discussed in detail above, there is sufficient evidence to support the imposition of both the compensatory and punitive damages against the defendant in this case. The amounts the jury awarded do not "shock the conscience" of this court, nor are they "monstrous" or "shocking." *See Eich*, 350 F.3d at 763. Therefore, the defendant's motion for remittitur of all amounts awarded is **denied**.

### D. New Trial

#### 1. Standards under Rule 59(e)

Rule 59(e) provides that a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *Fed. R. Civ. P.* 59(a)(1). The Eighth Circuit Court of Appeals has filled out this rather vague authorization for a new trial by explaining that "'[t]he key question is whether a new trial should [be] granted to avoid a miscarriage of justice.'" *Belk,* 228 F.3d at 878 (quoting *McKnight ex rel Ludwig v. Johnson Controls,* 36 F.3d 1396, 1400 (8th Cir. 1994)). Thus, "[a] new trial is appropriate where the verdict is against the clear weight of the evidence, clearly excessive, or the result of passion or prejudice." *MacGregor v. Mallinckrodt, Inc.,* 373 F.3d 923, 930 (8th Cir. 2004) (citing *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1294 (8th Cir. 1982)). In *White v. Pence*, 961 F.2d 776 (8th Cir. 1992), the Eighth Circuit observed:

With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir. 1984) (citation omitted). Similar language appears in *Brown [ex rel. Brown v. Syntex Labs., Inc.]*, 755 F.2d [668,] 671-73 [ (8th Cir. 1985) ]; *Slatton [v. Martin K. Eby Constr. Co.]*, 506 F.2d [505], 508 n. 4 [ (8th Cir. 1974)]; *Bates [v. Hensley]*, 414 F.2d [1006], 1011 [ (8th Cir. 1969)], and early authority cited in *Bates*. *See also Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1266 (8th Cir. 1987). These cases establish the fundamental process or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing motions for judgment as a matter of law.

*Id.* at 780. Thus, the court in *Pence* concluded the district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial results in a miscarriage of justice. *Id.; see also Ogden*, 214 F.3d at 1010 (stating that a motion for new trial should only be granted if the jury's verdict was against the great weight of the evidence so as to constitute a miscarriage of justice) (citation omitted); *Shaffer v. Wilkes,* 65 F.3d 115, 117 (8th Cir. 1995) (citing *Pence* for this standard); *Nelson,* 26 F.3d at 800 (stating "[a] motion for new trial should be granted if, after weighing the evidence, a district court concludes that the jury's verdict amounts to a miscarriage of justice."); *Jacobs Mfg. Co. v. Sam Brown Co.,* 19 F.3d 1259, 1266 (8th Cir. 1994) (observing that the correct standard for new trial is the conclusion that "the [jury's] verdict was against the 'great weight' of the evidence, so that granting a new trial would prevent a miscarriage of justice."). While a ruling on a motion for judgment as a matter of law is reviewed *de novo,* a motion for new trial is reviewed for "clear abuse of discretion." *See Belk,* 228

F.3d at 878. Indeed, "'[w]hen the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal.'" *Children's Broad. Corp.*, 357 F.3d at 867 (quoting *Jones v. Swanson*, 341 F.3d 723, 732 (8th Cir. 2003) (internal quotations omitted)).

### 2.  *The merits*

Here, the defendant contends allowing the jury verdict, with respect to the punitive damages, to stand would result in a miscarriage of justice due to Villalpando's incredible testimony at trial that she complained about Tomoson's conduct. This is so, avers the defendant, because her trial testimony directly conflicts with her deposition testimony and her responses on her ICRC questionnaire. In her deposition testimony, Villalpando indicated she did not remember if she complained to anyone regarding Tomoson's conduct. With respect to her ICRC questionnaire, Villalpando indicated she did not complain to anyone because she was afraid of Tomoson's response.

After reviewing the matter, the court finds that the jury's award of punitive damages to the plaintiffs was not against the great weight of the evidence—nor does the award result in a miscarriage of justice. There was evidence presented at trial that would support a finding that the defendant acted with callousness, or reckless indifference, to the plaintiffs' federally protected rights not to be discriminated against on the basis of their gender. The fact that Villalpando did not remember whether she complained as she testified during her deposition, is not directly at odds with her trial testimony. Often, discrepancies and inconsistencies arise with respect to a witness's deposition testimony and trial testimony. Villalpando was cross-examined at length regarding the inconsistency between her deposition testimony and her trial testimony, and she stood by her trial testimony without waiver, adequately explained the reason for her differing responses and was a credible witness. Additionally, at least with respect to Villalpando's testimony regarding the 1-800

hotline, it was corroborated by Lopez, in part, who testified everyone knew about the call the following day.[17] The mere fact of this discrepancy does not give this court cause to believe a new trial is warranted.

The defendant further argues, however, that based on Villalpando's answer on her ICRC questionnaire that essentially the jury verdict was based on false evidence. Thus, the defendant moves for a new trial on the basis that the plaintiffs proffered false testimony at trial involving a material issue. This court disagrees. The standard for granting a new trial based on false testimony is set forth in *Davis v. Jellico Community Hospital, Inc.*, 912 F.2d 129, 133 (6th Cir. 1990):

> [A] new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that without it, a jury might have reached a different conclusion; that the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial.

*Id.* at 133; *Gibson v. Total Car Franchising Corp.*, 223 F.R.D. 265, 279 (M.D.N.C. 2004) (applying *Davis* standard to motion for a new trial based on false testimony under Rule 59 in a fraud and unfair and deceptive trade practices case); *Williams v. United Dairy Farmers*, 188 F.R.D. 266 (S.D. Ohio 1999) (applying *Davis* standard to motion for new trial based on false testimony under Rule 59 in employment discrimination case); *see also Antevski v. Voklswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993) (citing *Davis* for proposition that if the verdict is based on false testimony, district judge has the discretion to grant the injured party a new trial under Rule 59). Applying this three-prong standard, the Court finds that a new trial is not warranted. First, although Villalpando's

_____

[17]Lopez, however, could only corroborate the fact that Villalpando called, not what she called to report. Rather, Lopez testified that she thought Villalpando only called to report that some of the workers were illegal.

response on the ICRC questionnaire is inconsistent with her trial testimony, it does not necessarily follow her trial testimony was false. This type of inconsistency is better addressed through cross-examination and impeachment of a witness, rather than in a post-trial motion. However, although the defendant had this questionnaire available to it prior to trial—indeed, the plaintiffs had it listed as a potential exhibit—neither party introduced the questionnaire into evidence, nor questioned Villalpando regarding her reasons for this inconsistency. However, as mentioned above, Villalpando's testimony was extremely credible. When cross-examined about the inconsistency in her deposition testimony, she was resolved to stand by her trial testimony. Additionally, and importantly, the ICRC questionnaire is not a sworn statement. Furthermore, Villalpando is not fluent in the English language, the language in which the form was prepared. Further, the word "complaint" is not defined and Villalpando could have interpreted the term to mean a formalized complaint. Additionally, it is apparent Villalpando was confused by the questionnaire because later, in the same questionnaire, she indicates she informed the union steward, Freeman, of her dissatisfaction with her job and supervisor prior to her resignation. This statement corroborates her testimony at trial that she complained to Freeman regarding Tomoson and her working environment on a regular basis. Accordingly, simply because Villalpando filled out, somewhat inconsistently, her ICRC questionnaire does not, in the eyes of this court, undermine her credibility as a witness with respect to this particular issue, or any other issue.

Second, based on the overwhelming evidence presented at trial regarding the defendant's reprehensible and discriminatory conduct, it is unlikely the jury would have reached a different conclusion. First, the jury was aware Aramark disputed Villalpando's testimony that she complained to Wisecup. Wisecup himself testified he received no complaints. The jury was also aware Aramark disputed the fact that Villalpando called the

1-800 hotline. Herzberger testified no employee utilized the 1-800 hotline to report sexual harassment, only that the hotline was called to report Tomoson was sleeping in his truck. Although Lopez corroborated Villalpando's call, she was unable to corroborate exactly what Villalpando called to report. However, the jury chose to credit Villalpando's testimony in spite of these facts. Further, even if this court were to assume the falsity of Villalpando's testimony, this factor does not tip the scales in the defendant's favor. The problem arises, in this court's eyes, in the defendant's refusal to acknowledge that it is imputed with liability for Tomoson's conduct because he served in a managerial capacity. Accordingly, *even if* this court were to disbelieve Villalpando's testimony in this aspect, a new trial would not be warranted. This is so, because the conduct of Tomoson alone supported the jury's verdict and provided a basis for imputing liability to the defendant. The defendant glosses over the fact that it is charged with liability for Tomoson's conduct, and instead asserts it did not receive knowledge of the harassment until after Lopez was terminated. This is but one way, however, that liability can be imputed to an employer. The other way, as discussed previously, is vis a vis the conduct of an employee entrusted to serve in a managerial capacity. Furthermore, Villalpando's credibility with respect to this issue has no impact on the existence of a defunct training program on EEO at Aramark and Aramark's refusal to admonish or reprimand Tomoson or institute new policies and procedures following Lopez's formal complaint. Accordingly, it would be absurd to conclude the jury would have reached a different result based on whether Villalpando reported the conduct.

Finally, the third element clearly cannot be satisfied in this case. Although the defendant may have been taken by surprise by Villalpando's testimony, the defendant clearly had the ICRC questionnaire available and can be charged with its knowledge at the time of trial. Accordingly, a new trial is not warranted on any of the grounds asserted by

the defendant and the defendant's motion for a new trial is **denied** in its entirety.

### III.  CONCLUSION

The court has considered each of the grounds raised in the defendant's Motion For Judgment As A Matter Of Law, And, Alternatively For New Trial, And For Remittitur Of All Amounts Awarded and concludes that the motion must be **denied** on all grounds.  The court notes that it previously reserved ruling on the plaintiffs' Fee Application and the defendant's resistance thereto until the resolution of these post-trial motions in recognition of the fact that additional service may have been provided by counsel in order to defend against the defendant's exorbitant post-trial motions.  Therefore, the plaintiffs shall have to and including April 28, 2006, in which to file a supplemental fee application for fees and expenses incurred subsequent to the date of the original fee application.  The defendant shall then have to and including May 5, 2006, in which to file a response to the plaintiffs' supplemental fee position.

**IT IS SO ORDERED.**

**DATED** this 13th day of April, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA